**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq. (KR 4963)
Jeffrey D. Prol, Esq. (JP 7454)
Thomas A. Pitta, Esq. (TP 3018)
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400
*Proposed Counsel to the Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| STATE INSULATION CORPORATION, | Case No. 11-15110 (    ) |
| Debtor. | |

**DECLARATION OF GEORGE LIONIKIS, JR.
IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

**GEORGE LIONIKIS, JR.**, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am the Chief Executive Officer of State Insulation Corporation (the "Debtor").

2. In accordance with the relevant resolutions and/or authorizations filed simultaneously with the Debtor's chapter 11 petition, I have been authorized to submit this Declaration in support of the applications and motions (collectively, the "First Day Pleadings")[1] which have been or will be filed with the Court in connection with the commencement of this chapter 11 case and to assist the Court and other parties in interest in understanding the circumstances that precipitated the commencement of this chapter 11 case.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the Debtor's operations, financial condition

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the applicable First Day Pleading.

and the industry as a whole. If I were called upon to testify, I would testify competently to the facts set forth herein.

4. In my capacity as Chief Executive Officer, I am responsible for the oversight of the Debtor's affairs and, as a consequence, I have detailed knowledge of all aspects of the Debtor's operations.

5. On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey.

6. The Debtor intends to operate its businesses and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**A.     The Debtor's Business Operations**

7. The Debtor is a corporation organized under the laws of the State of New Jersey with corporate headquarters located at 525 Johnstone Street, Perth Amboy, New Jersey.

8. The Debtor was incorporated in 1961 as a distributor of insulation products and accessories for the installation of insulation. The Debtor has never manufactured any products. The Debtor employs twenty-four people and its sales are focused in New York, New Jersey, Pennsylvania and certain foreign markets. The Debtor delivers the products it sells using its own fleet of trucks and by common carriers, including shipping product overseas via steamship.

9. During 2008, the Debtor grew to approximately $24 million in sales, however, due to the downturn in the world economy, the Debtor's sales for 2010 are forecast to be $14 million. The Debtors do not anticipate returning to the revenue levels of 2008 in the near future as the economy recovers from the recession of 2009.

**B.     The Debtor's Prepetition Financing**

10. Prior to the Petition Date, the Debtor and JPMorgan Chase Bank, N.A. ("Chase") entered into a Business Loan Agreement dated July 23, 2010 (the "Chase Loan Agreement") pursuant to which Chase agreed to make available to the Debtor a line of credit (the "Chase

Case 11-15110-MBK    Doc 2    Filed 02/23/11    Entered 02/23/11 13:46:49    Desc Main
Document      Page 3 of 15


Loan") of up to $1,500,000, limited to an amount supported by a borrowing base consisting of certain eligible accounts and eligible inventory (as more particularly described in the Chase Loan Agreement). In connection with the Chase Loan, the Debtor executed and delivered to Chase a promissory note dated July 23, 2010 (the "Chase Note"), pursuant to which the Debtor promised to pay to Chase the principal sum of $1,500,000, or so much thereof as borrowed by the Debtor under the Chase Loan Agreement, together with interest thereon at a variable rate based on the LIBOR Rate, calculated on a 360-day year, with all unpaid principal, interest, and other charges due in full on July 23, 2011. Pursuant to the Chase Loan Agreement, the Debtor's obligations under the Chase Loan were secured by all inventory, chattel paper, accounts, equipment and general intangibles of the Debtor including, (a) all accessions, attachments, accessories, tools, parts, supplies, replacements and additions to any of the foregoing, (b) all products and produce of any of the foregoing, (c) all accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease or other disposition of any of the foregoing, (d) all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the foregoing, and sums due from a third party who has damaged or destroyed any of the foregoing, whether due to judgment, settlement or other process, and (e) all records and data relating to any of the foregoing, whether in the form of writing, photograph, microfilm, microfiche, or electronic media, together with Chase's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media. In addition, in connection with the Chase Loan, George Lionikis, Sr. ("Lionikis Sr.") executed and delivered to Chase a Commercial Guaranty under which Mr. Lionikis guaranteed the Debtor's obligations under the Chase Note.

11. On February 11, 2011, I&G[2] purchased the Chase Loan from Chase and the Debtor and I&G entered into an Amended and Restated Loan Agreement (the "I&G Loan Agreement") pursuant to which I&G agreed to make loans of up to $1,500,000 to the Debtor,

---

[2] I&G is owned by George Lionikis, Sr.

subject to the terms and conditions of the I&G Loan Agreement. Pursuant to the I&G Loan Agreement, the Debtor's obligations under the I&G Loan Agreement are secured by all personal property and fixtures of the Debtor whether presently existing or existing in the future or presently owned or acquired in the future by the Debtor and whether or not subject to the Uniform Commercial Code, including, but not limited to, all goods, money, instruments, accounts, farm products, inventory, equipment, documents, chattel paper, investment property, deposit accounts, supporting obligations and general intangibles, and all interest, dividends and other distributions thereon paid and payable in cash or property, and all replacements and substitutions for, all accessions and additions to, and all products and proceeds of, all of the foregoing (the "Prepetition Collateral"). As of the Petition Date, the principal balance due under the I&G Loan Agreement is $500,000 (the "Prepetition Indebtedness").

C.     **History of the Debtor's Asbestos Litigation**

12.     From the Debtor's formation through 1977, the Debtor distributed many different insulation products, a small percentage of which contained asbestos as an ingredient. For the most part, manufacturers ceased using asbestos in insulation products by 1972, however, two products the Debtor distributed continued to contain asbestos for some time thereafter. The Debtor sold a very limited quantity of those two products.

13.     The Debtor was named as a defendant in an asbestos case for the first time in 1978. Throughout the eighties and nineties, the claims continued to come in, although the Debtor was able to have many cases dismissed as a result of the Debtor's production of evidence demonstrating it had not sold asbestos containing products to the claimant's (a) employers or (b) jobsite. The number of claims filed against the Debtor has declined significantly since 1998. In 1998, 384 claims were filed; in 2009, there were only 39 filed. There are currently approximately 90 asbestos-related actions against the Debtor pending.

14.     At the rate the asbestos claims were being filed against and being settled by the Debtor and its insurance carrier, it appeared that the Debtor would be able to address all of the

claims through (a) the insurance currently in place (approximately $1.3 million remains) and (b) after exhaustion of the insurance proceeds, with cash flow from operations. However, in recent years, there has been an increase in the number of mesothelioma claims, which often result in larger settlements than other asbestos-related claims. Up until 2009, with over 5000 claims either settled or dismissed, the Debtor had only paid a handful of settlements in excess of $100,000, but in 2009 the Debtor had to settle a single claim for $525,000. As of the Petition Date, there are a number of mesothelioma cases that are scheduled for trial or likely to be in the near future.

15. While there are fewer and fewer defendants as time passes, the claims are now much larger and the Debtor will be unable to sustain the defense of the remaining and anticipated claims out of the remaining insurance or cash flow, particularly in light of the decline in the Debtor's operating revenues that began in 2009 and is expected to continue for the foreseeable future.

16. As a result, the Debtor has commenced this case in an effort to reorganize and provide for payment of its asbestos and other liabilities and preserve its business for the benefit of all creditors and other stakeholders.

## FIRST DAY PLEADINGS

17. As a result of my first-hand experience, and through my review of various materials and information, discussions with other members of the Debtor's management, and discussions with the Debtor's outside advisors, I have formed opinions as to (i) the necessity of obtaining the relief sought by the Debtor in the First Day Pleadings, (ii) the need for the Debtor to continue to operate effectively, (iii) the deleterious effects upon the Debtor of not obtaining such relief, and (iv) the immediate and irreparable harm to which the Debtor and its estate will be exposed immediately following the Petition Date unless the relief requested in the First Day Pleadings is granted without delay.

18. The relief sought in the First Day Pleadings will minimize the adverse effects that this chapter 11 case will have on the Debtor and its estate. I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtor to operate effectively in chapter 11 as a debtor-in-possession.

19. As described more fully below, the relief requested in the First Day Pleadings was carefully tailored by the Debtor, in consultation with their professionals, to ensure that the Debtor's immediate operational needs are met and that the Debtor suffers no immediate and irreparable harm. I personally participated in the analysis that lead to the creation of each of the First Day Pleadings and assisted in the drafting and development of the relief requested therein. At all times, the Debtor's management and professionals remained cognizant of the limitations imposed on debtors in possession, and in light of those limitations, the Debtor narrowed the relief requested at the outset of these cases to those issues that require urgent relief to sustain the Debtor's operability, pending confirmation of a plan of reorganization pursuant to chapter 11 of the Bankruptcy Code.

A. ***Debtor's Motion for an Order (I) Authorizing the Debtor to Use Cash Collateral and Provide Adequate Protection; (II) Authorizing the Debtor to Obtain Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105(a) and 364(c); (III) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (IV) Scheduling Final Hearing Pursuant to Fed. R. Bankr. P. 4001; and (V) Granting Related Relief (the "DIP Financing Motion")***

20. By the DIP Financing Motion, the Debtor seeks, the entry of an order, pursuant to sections 105(a), 362, and 364(c) of title 11 of the Bankruptcy Code and Rule 4001 of the Bankruptcy Rules:

    (a) authorizing the Debtor to use Cash Collateral; provided that all expenditures of Cash Collateral shall be pursuant to the DIP Budget;

    (b) authorizing the Debtor to obtain the DIP Financing up to an aggregate principal amount of $1,500,000; provided that, prior to the Final Order, the Debtor may only borrow on an interim basis up to an aggregate principal amount of

      $200,000, and provided further that all interim and final borrowings shall be pursuant to the DIP Budget;

  (c) authorizing the Debtor to enter into such documents, instruments and agreements as are required to implement the terms of the DIP Orders, and to perform such other and further acts as may be required in connection with the I&G Loan Agreement;

  (d) granting replacement liens of the Prepetition Collateral subject and junior only to the post-petition liens described below;

  (e) granting security interests, liens and superpriority claims (including a superpriority claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) in favor of I&G, to secure the DIP Financing;

  (f) modifying the automatic stay imposed by section 362 of the Bankruptcy Code as required to permit I&G to implement the terms of the DIP Orders and, upon the occurrence and during the continuance of an Event of Default, to exercise all rights and remedies in the I&G Loan Agreement as set forth in the Interim Order; and

  (g) scheduling a final hearing ("Final Hearing"), to be held no later than thirty (30) days after entry of the Interim Order, to consider entry of the Final Order approving certain notice procedures in connection therewith.

  21. As described in detail in the DIP Financing Motion, I&G is willing to permit the Debtor to use cash collateral (as defined by section 363(a) of the Bankruptcy Code, including, any prepetition proceeds and, subject to section 552 of the Bankruptcy Code, any and all post-petition proceeds of the Prepetition Collateral (the "Cash Collateral") and to operate under the I&G Loan Agreement as modified in certain respects by the Interim Order. In addition, I&G is willing to provide the Debtor with access to additional post-petition credit (the "DIP Financing"), inclusive of the prepetition Indebtedness, in the maximum amount of $1,500,000 on the terms set forth I&G Loan Agreement. Accordingly, the Debtor intends to obtain the DIP Financing from

I&G in order to operate its business and pay its obligations when they come due in accordance with the DIP Budget.

22. The Debtor does not have sufficient liquidity to operate its business and in the ordinary course without a line of credit in place. The Debtor's ability to maintain business relationships with its vendors, suppliers and customers, to pay its employees, and to otherwise fund its operations, is essential to the Debtor's continued viability. Thus, the ability of the Debtor to obtain sufficient working capital and liquidity through the proposed DIP Financing is vital to the Debtor's reorganization efforts. Accordingly, the Debtor has an immediate need to obtain the DIP Financing in order to permit, among other things, the orderly continuation of the operation of the Debtor's business, to minimize the disruption of the Debtor's business operations and to manage and preserve the assets of its estate in order to maximize the recovery to all creditors.

23. The Debtor believes that it would be futile, under the circumstances, to pursue alternative post-petition financing in the form of: (1) unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code; (2) unsecured credit allowable under sections 364(a) and 364(b) of the Bankruptcy Code; or (3) secured credit pursuant to section 364(c) of the Bankruptcy Code, on more favorable terms and conditions from sources other than I&G. I&G has agreed to provide the DIP Financing on terms well below market, especially as a result of (a) the lack of any commitment or similar fees and (b) the low interest rate charged by I&G. Accordingly, in exchange for the DIP Financing, the Debtor proposes to provide I&G with the reasonable protections described below, including first-priority liens on all of the Debtor's assets (the "<u>DIP Collateral</u>," as more particularly described in the DIP Financing Motion).

24. Furthermore, absent the use of the Cash Collateral, the Debtor will be unable to meet its obligations in order to operate on a day-to-day basis and therefore maintain the value of its business as a going-concern. Accordingly, the Debtor has demonstrated that it has an emergent need for the use of cash collateral.

25. In light of the foregoing, the Debtor submits, and I believe, that the relief requested in the DIP Financing Motion is in the best interest of the Debtor, its estate and creditors, and therefore should be granted.

**B.** ***Debtor's Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363(c) and 1107 (I) Authorizing the Debtor to Continue and Maintain Its Existing Cash Management System, Bank Accounts and Business Forms, (II) Modifying the Investment Guidelines Set Forth in 11 U.S.C. § 345, and (III) Granting Related Relief (the "<u>Cash Management Motion</u>")***

26. By the Cash Management Motion, the Debtor seeks the entry of an Order, substantially in the form submitted herewith, pursuant to 105(a), 345(b), 363(c) and 1107 of the Bankruptcy Code:

(a) authorizing the Debtor, on the terms set forth below, to continue to use the Cash Management System without interruption in the ordinary course of business;

(b) prohibiting JP Morgan Chase from offsetting, affecting or otherwise impeding the use or transfer of or access to any funds, contained or deposited in the Operating Account which is utilized in the Debtor's day-to-day operations on or subsequent to the commencement of this chapter 11 case for any reason or on account of any claim (as defined in section 101(5) of the Bankruptcy Code) of the Banks;

(c) directing JP Morgan Chase to transfer, in accordance with prepetition practices, or at the request and direction of the Debtor, any funds in the Operating Account to the extent set forth in the Cash Management Motion;

(d) authorizing the Debtor to maintain and continue to use the Operating Account with the same account number, and directing that the Operating Account be treated for all purposes as a debtor-in-possession account;

(e) authorizing and directing JP Morgan Chase to service and administer the Operating Account without interruption and in the usual and ordinary course, and to receive, process, honor and pay any and all checks and drafts drawn on the Operating Account, whether presented, drawn or issued before or after the Petition Date for payment by the holders or makers thereof, for any obligations of the Debtor for which payment is authorized by Court Order, provided that sufficient funds exist, whether deposited prior or subsequent to the commencement of the Debtor's chapter 11 case, to cover such checks upon presentment;

  (f) authorizing the Debtor to use, in their present form, existing checks and other documents, including their existing business forms (collectively, the "<u>Business Forms</u>"), relating to the Operating Account, <u>provided</u>, <u>however</u>, that in the event that the Debtor must purchase new checks or business forms during the pendency of this chapter 11 case, such forms will include a legend referring to the Debtor's status as a debtor-in-possession; and

  (g) granting a waiver of the investment guidelines of section 345 of the Bankruptcy Code, subject to a 60-day objection period for the United States Trustee.

  27. As described in detail in the Cash Management Motion, the Debtor maintains a cash management and disbursement system in the ordinary course of its operations (the "<u>Cash Management System</u>"). To lessen the disruption caused by the bankruptcy filings and to maximize the value of the estates in this chapter 11 proceeding, it is vital that the Debtor maintain the Cash Management System, the Operating Account and the Business Forms.

  28. The Debtor will work closely with JP Morgan Chase to ensure that appropriate procedures are in place so that checks issued prior to the Petition Date, but presented after the Petition Date, will not be honored absent approval from the Court. The Debtor will also maintain records of all transfers within the Cash Management System, so that all transfers and transactions will be documented in its books and records to the same extent such information was maintained by the Debtor prior to the Petition Date.

  29. Permitting the Debtor to use its existing Cash Management System and Operating Account is in the best interests of the Debtor's estate, its creditors and other interested parties. It is critical that the Debtor be able to coordinate transfers of funds to efficiently and effectively operate their business. Through the Cash Management System and Operating Account, the Debtor is able to effectively and efficiently collect, transfer, and disburse funds as needed, as well as to efficiently monitor and control the movement of cash.

  30. To require the Debtor to use new accounts would be disruptive to its business and would impair its efforts to maximize the value of its estate for the benefit of its creditors and parties in interest.

31. Conversely, maintenance of the Debtor's Cash Management System and Operating Account would avoid delays in the payment of necessary expenses, and will ensure a smooth transition into chapter 11 without the inconvenience, cost, confusion and delay associated with transferring cash management operations to new accounts. By allowing the continued use of the Debtor's existing Cash Management System and Operating Account, the Debtor will have the unimpeded cash flow necessary for the interim maintenance of their operations. Accordingly, the Debtor respectfully requests authorization to maintain its existing Cash Management System and Operating Account in the ordinary course of business, provided that no prepetition checks, drafts, wire transfers, or other forms of tender that have not yet cleared as of the Petition Date will be honored unless authorized by separate order of this Court.

32. The Debtor also requests authority to preserve various reporting and accounting mechanisms, such as signatory authorizations and accounting systems central to the maintenance of the Operating Account. The interruption or termination of such reporting and accounting mechanisms would undermine the utility of the Operating Account. In accordance with existing practices, the Debtor will maintain strict records of all receipts and disbursements from the Operating Account during the pendency of this case and will ensure that its records properly distinguish between pre- and post-petition transactions.

33. Additionally, requiring the Debtor to change its Business Forms would be expensive, unnecessary and burdensome to the Debtor's estate and disruptive to the Debtor's business operations and would not confer any benefit upon the Debtor, its estate, its creditors or those dealing with the Debtor. The Debtor proposes that in the event that it must purchase new Business Forms during the pendency of this chapter 11 case, such forms will include a reference to the Debtor's status as a debtor-in-possession.

34. Waiver of the investment guidelines in the Bankruptcy Code is appropriate in this case as the Operating Account is maintained with JP Morgan Chase, a financially sound banking institution. The funds are not encumbered by any creditors' liens and/or security interests other than those held by JP Morgan Chase as the Debtor's lender. Consequently, a waiver of the

deposit guidelines would not pose a risk to the Debtor's estate, nor its creditors. Furthermore, requiring the Debtor to issue bonds in favor of the United States, as the statute requires, would cause substantial unnecessary expense to the Debtor's estate.

35. Accordingly, granting a waiver of the requirements of section 345 of the Bankruptcy Code will facilitate a smooth and orderly transition of its business into chapter 11 and minimize the disruption of this transition.

36. In light of the foregoing, the Debtor submits, and I believe, that the relief requested in the Cash Management Motion is in the best interest of the Debtor, its estate and creditors, and therefore should be granted.

C. *Debtor's Motion for Entry of an Interim Order and a Final Order (I) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service on Account of Prepetition Invoices, (II) Deeming Utility Companies to Have Adequate Assurance of Future Payment, and (III) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) and 366 (the "Utilities Motion")*

37. By the Utilities Motion, the Debtor seeks entry of an Interim Order and a Final Order, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (i) prohibiting all utility companies (the "Utility Companies") from discontinuing, altering or refusing service to the Debtor on account of prepetition invoices, (ii) deeming the Utility Companies to have adequate assurance of future performance on the basis of payment of a Utility Deposit (defined below) and (iii) establishing procedures for resolving requests for additional assurance of payment.

38. The Debtor incurs utility expenses in the ordinary course of business for, among other things, electricity, gas, local telephone service, long-distance telephone service, internet service and wireless telephone service, at an average monthly cost of approximately $6,000. A non-exhaustive list of the Utility Companies is attached hereto as **Exhibit C** to the Utilities Motion.

39. The Debtor proposes to provide each Utility Company, as identified on Exhibit C, with a deposit, equivalent to the estimated average value of utility consumption for a one-month period (the "Utility Deposit"), also identified in Exhibit C.

-12-

40. Additionally, the Debtor seeks to establish reasonable procedures by which Utility Companies may request additional adequate assurance of future payment, in the event that a Utility Company believes that the Utility Deposit does not provide them with satisfactory adequate assurances, which procedures are more fully described in the Utilities Motion.

41. Uninterrupted utility services are essential to the continuation of Debtor's ongoing operations and to the success of the Debtor's chapter 11 efforts. The Debtor's operations will be severely impacted should one or more Utility Companies refuse or discontinue utility services for even a brief period of time. Interruption of utility services, to the extent that such interruption limits the Debtor's operations, will damage the Debtor's sales revenues and profits. In addition, interruption of utility services may damage the Debtor's relationships with its customers and will be detrimental to the estate, to the Debtor's creditors and to the Debtor's employees. Any disruption to the Debtor's operations as a result of termination of utility services will frustrate the Debtor's reorganization efforts. Thus, it is critical that the Debtor's utility services continue uninterrupted.

42. In light of the foregoing, the Debtor submits, and I believe, that the relief requested in the Utilities Motion is in the best interest of the Debtor, its estate and creditors, and therefore should be granted.

**D.** ***Debtor's Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 507(a) (I) Authorizing the Debtors to Pay PrePetition Wages and Salaries and Related Obligations and Taxes and (II) Directing All Banks to Honor Checks and Transfers For Payment of Prepetition Employee Obligations (the "Employee Wage Motion")***

43. By this motion, the Debtor seeks an order authorizing, but not directing, the Debtor to (i) pay all prepetition Employee claims for wages, salaries, contractual compensation, sick pay, personal pay, holiday pay and other accrued compensation; (ii) make all payments for which Employee payroll deductions were made prepetition; (iii) reimburse all prepetition Employee business expenses; (iv) make prepetition contributions and pay benefits under certain Employee benefit plans; (v) honor workers' compensation programs; (vi) pay other

miscellaneous Employee-related costs including but not limited to processing costs and fees; and (vii) continue Employee programs with respect to vacation, sick, personal and holiday leave and continue certain health, welfare, savings and other benefit programs (collectively, the "Employee Obligations"), as more fully described in the Employee Wage Motion.

44. In the ordinary course of its business, the Debtor employs 24 individuals (the "Employees"). The Debtor recognizes that any delay in paying outstanding wages, salaries and other compensation to the Employees could severely disrupt the Debtor's relationship with its Employees, impair morale and disrupt the Debtor's business operations.

45. No individual Employee will receive payment in excess of the $11,725 priority claim amount established pursuant to section 507(a)(4) and 507(a)(5) of the Bankruptcy Code on account of outstanding compensation, including wages, salaries, contractual compensation, sick pay, personal pay, holiday pay and other accrued compensation. The Debtor believes that the payment of the Employee Obligations is critical, especially in light of the need to maintain the morale of the Debtor's Employees during the pendency of this chapter 11 case.

46. In light of the foregoing, the Debtor submits, and I believe, that the relief requested in the Employee Wage Motion is in the best interest of the Debtor, its estate and creditors, and therefore should be granted.

**E.     *Motion Pursuant to Fed. R. Bankr. P. 1007(c) for an Order Granting the Debtor an Extension of Time to File Its Schedules and Statement of Financial Affairs (the "Schedules Extension Motion")***

47. By the Schedules Extension Motion, the Debtors seeks an order pursuant to Bankruptcy Rule 1007(c) of the Federal Rules of Bankruptcy Procedure granting the Debtor an extension of time to its file schedules of assets, liabilities, executory contracts, and statement of financial affairs for approximately fourteen (14) additional days through and including March 23, 2011.

48. The Debtor has commenced the extensive process of gathering the necessary information to prepare and finalize the Schedules and SOFA, but believes that the 14 day time

-14-

period to file the Schedules and SOFA provided by Bankruptcy Rule 1007 will not be sufficient to permit completion of the Schedules and SOFA. The Debtor is also gathering the necessary information requested by the Office of the United States Trustee and then will focus on gathering the information for the Schedules and SOFA.

49. In light of the foregoing, the Debtor submits, and I believe, that the relief requested in the Schedules Extension Motion is in the best interest of the Debtor, its estate and creditors, and therefore should be granted.

## **CONCLUSION**

50. For the reasons stated herein and in each of the First Day Pleadings filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Pleadings be granted in their entirety, together with such other and further relief as this Court deems just and proper.

51. I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Executed this 23 day of February, 2011
Perth Amboy, New Jersey

_____
George Lionikis, Jr.
Chief Executive Officer