**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq. (KR 4963)
Jeffrey D. Prol, Esq. (JP 7454)
Thomas A. Pitta, Esq. (TP 3018)
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400

*Counsel to the Debtor and Debtor-in-Possession*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Chapter 11 |
| STATE INSULATION CORPORATION, | Case No. 11-15110 (MBK) |
| Debtor. | |

## INITIAL DISCLOSURE STATEMENT FOR
## INITIAL CHAPTER 11 PLAN OF REORGANIZATION
## OF STATE INSULATION CORPORATION

**THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT PROVIDES FOR THE ISSUANCE OF INJUNCTIONS UNDER §§ 524(g) AND 105(a) OF THE BANKRUPTCY CODE THAT RESULT IN THE CHANNELING OF ALL ASBESTOS RELATED LIABILITIES OF STATE INSULATION CORPORATION, INC. INTO A TRUST AS MORE FULLY DESCRIBED HEREIN. SEE SECTION 5.5 "EFFECTS OF PLAN CONFIRMATION" FOR A DESCRIPTION OF SUCH INJUNCTIONS.**

State Insulation Corporation ("State Insulation") is providing this Disclosure Statement and its attached Exhibits, the accompanying voting instructions and Ballot and the related materials delivered with this Disclosure Statement pursuant to § 1126(b) of the Bankruptcy Code, in connection with this solicitation of votes for the Chapter 11 Plan of Reorganization for State Insulation Corporation (the "Plan"), a copy of which is attached to this Disclosure Statement as Exhibit A.

Please consult the Glossary of Defined Terms for the Disclosure Statement and Chapter 11 Plan of Reorganization, a copy of which is attached to this Disclosure Statement as Exhibit B, for the meaning of defined terms used in the Plan and this Disclosure Statement.

State Insulation filed its voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code on February 23, 2011. State Insulation intends to seek confirmation of the Plan if it receives the requisite acceptances necessary to confirm the Plan under § 1126(c) of the Bankruptcy Code and to obtain the injunctions set forth in the Plan under §§ 524(g) and/or 105 of the Bankruptcy Code.

Holders of General Unsecured Claims Other than Asbestos Claims are estimated to receive approximately 100% of the Allowed Amount of their Claims under the Plan. All present and future Asbestos Claims will be channeled to the State Insulation Corporation Asbestos Trust (also referred to as the "Asbestos Trust") for payment as and to the extent provided in the Trust Agreement and the Trust Distribution Procedures (or "TDP"), each of which will be in a form substantially similar to the documents attached as Exhibit 2 to the Plan.

STATE INSULATION BELIEVES THAT THE PLAN IS IN THE BEST INTEREST OF STATE INSULATION'S CREDITORS. ACCORDINGLY, CREDITORS ARE URGED TO VOTE IN FAVOR OF THE PLAN.

**The Official Committee of Unsecured Asbestos Claimants and the Legal Representative for Future Asbestos Claimants also support the Plan and recommend that creditors vote to accept it.**

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN TIME, ON [ , 2011] (THE **"VOTING DEADLINE"**). IN ORDER TO BE COUNTED, BALLOTS MUST BE RECEIVED BY LOWENSTEIN SANDLER PC, 65 LIVINGSTON AVENUE, ROSELAND, NJ 07068, ATTN: THOMAS A. PITTA, ESQ., (THE **"BALLOTING AGENT"**) AT 65 LIVINGSTON AVENUE, ROSELAND, NJ 07068, ON OR BEFORE THE VOTING DEADLINE. VOTING INSTRUCTIONS ARE ATTACHED TO THE BALLOT DISTRIBUTED WITH THIS DISCLOSURE STATEMENT.

THE ONLY CLASS ENTITLED TO VOTE ON THE PLAN OF REORGANIZATION IS CLASS 4 (ASBESTOS CLAIMS). THE HOLDERS OF CLAIMS IN CLASS 4 ARE IMPAIRED UNDER THE PLAN. BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF CLAIMS IN CLASS 4 ARE URGED TO CONSIDER CAREFULLY THE

INFORMATION REGARDING TREATMENT OF THEIR CLAIMS CONTAINED IN THIS DISCLOSURE STATEMENT.

CREDITORS ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN ATTACHED HERETO AS EXHIBIT A, AND THE MATTERS DESCRIBED IN THE DISCLOSURE STATEMENT UNDER SECTION 8 BELOW, "RISKS OF THE PLAN" AND SECTION 9 BELOW, "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN," PRIOR TO CASTING THEIR VOTES.

The information contained in this Disclosure Statement is provided solely to permit certain parties in interest to make informed decisions to accept or reject the Plan. In making a decision, Asbestos Claimants must rely on their own examination of State Insulation's Disclosure Statement and the terms of the Plan, including the merits and risks involved. Claimants should not construe the contents of this Disclosure Statement, or any prior or subsequent communications or information provided by State Insulation or any of its representatives or advisors, as providing any legal, business, financial, or tax advice. **EACH PARTY ENTITLED TO VOTE SHOULD CONSULT WITH HIS, HER, OR ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS WITH RESPECT TO ANY MATTERS CONCERNING THIS DISCLOSURE STATEMENT AND THE PLAN AND THE TRANSACTIONS THEY CONTEMPLATE.**

No Person has been authorized by State Insulation in connection with the Plan or this Solicitation to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or referred to herein.

The statements contained in this Disclosure Statement are made as of the date hereof, and the delivery of this Disclosure Statement will not, under any circumstance, create any implication that the information contained herein is correct at any time subsequent to the date hereof. Estimates, if any, in respect of a Claim set forth in this Disclosure Statement or any Exhibit hereto may vary from the amount ultimately Allowed in respect of such Claim by the Bankruptcy Court.

This Disclosure Statement contains projected financial information regarding State Insulation and Reorganized State Insulation and certain other forward-looking statements. Such analysis is based upon historical financial records and assumptions by the management of State Insulation. Although the assumptions contained herein are considered reasonable, actual financial results may vary from the projected results and such variances may be material.

The information contained herein has not been subjected to an examination in accordance with generally accepted auditing or attestation standards. State Insulation and its representatives expressly disclaim any representations or warranties as to the existing or future correctness, accuracy, or completeness of State Insulation's books and records and the enclosed information, and do not make and expressly disclaim any representations, warranties, promises, covenants, or guarantees of any kind with respect to the value, nature, quality, or condition of the assets, the income to be derived from such assets, or the suitability of the assets for any and all activities and uses that may be contemplated.

The information contained in this Disclosure Statement, including, but not limited to, the information regarding the history, businesses, and operations of State Insulation, the historical and projected financial information of State Insulation (including the projected results of operations of Reorganized State Insulation) and the liquidation analysis relating to State Insulation is included herein for purposes of soliciting the acceptances required to confirm the Plan under § 1126(c) of the Bankruptcy Code and to obtain the Injunctions set forth in the Plan under §§ 524(g) or 105(a) of the Bankruptcy Code. As to any contested matters that may arise, however, such information is not to be construed as admissions or stipulations but rather as statements made in settlement negotiations.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

# TABLE OF CONTENTS

**Page**

ARTICLE 1 INTRODUCTION ................................................................................1

  1.1    Filing of State Insulation's Chapter 11 Reorganization Case. ......................1

  1.2    Purpose of the Disclosure Statement. ..........................................................2

  1.3    Hearing on Confirmation of the Plan. ..........................................................2

  1.4    Sources of Information. .................................................................................2

ARTICLE 2 EXPLANATION OF CHAPTER 11 ....................................................4

  2.1    Overview of Chapter 11. ...............................................................................4

  2.2    Plan of Reorganization. ................................................................................4

  2.3    Confirmation of Plan. ...................................................................................5

  2.4    Requirements for Confirmation of the Plan. ................................................6

  2.5    Acceptances Necessary to Confirm the Plan. ..............................................6

  2.6    Cramdown. .....................................................................................................7

  2.7    Overview of State Insulation's Plan of Reorganization. ..............................7

ARTICLE 3 GENERAL INFORMATION ............................................................10

  3.1    The Company; Corporate Structure; Management; and Debt Structure. .....10

  3.2    Equity Structure. ........................................................................................12

  3.3    Factors Leading to the Need for Bankruptcy Relief. ..................................12

  3.5    Filing of Reorganization Case. ...................................................................15

ARTICLE 4 OPERATIONS DURING THE REORGANIZATION CASE ..............15

  4.1    Commencement of the Reorganization Case. .............................................15

  4.2    Administration of the Reorganization Case. ...............................................15

  4.3    Professionals and Committees. ...................................................................16

  4.4    Claims Process. ...........................................................................................17

  4.5    Exclusivity. .................................................................................................17

  4.6    Preferences and Fraudulent Conveyance Actions. ......................................18

ARTICLE 5 DISCUSSION OF THE PLAN ...........................................................18

  5.1    Classification. ..............................................................................................18

  5.2    Satisfaction of Claims and Interests. ..........................................................19

  5.3    Means for Execution of the Plan. ...............................................................22

5.4     Conditions to Plan Confirmation and Conditions to Effectiveness of the Plan...........25

5.5     Effects of Plan Confirmation. .......................................................................28

5.6     Treatment of Executory Contracts, Unexpired Leases and Settlements.....................33

5.7     Effectuation and Supervision of the Plan........................................................34

5.8     Insurance Neutrality.................................................................................36

5.9     Miscellaneous Provisions...........................................................................37

5.10    Modification of the Plan. ..........................................................................39

ARTICLE 6 ASBESTOS TRUST AND TRUST DISTRIBUTION PROCEDURES..................40

6.1     Establishment and Purpose of the Trust...........................................................40

6.2     Asbestos Trust Assets. ..............................................................................40

6.3     Trust Promissory Note. .............................................................................41

6.4     Receipt of Asbestos Trust Assets; Certain Obligations. .......................................41

6.5     Discharge of Liabilities to Holders of Asbestos Claims........................................42

6.6     Asbestos Trust Expenses............................................................................42

6.7     Selection of the Initial Trustee.....................................................................42

6.8     The Legal Representative for Future Asbestos Claimants.......................................42

6.9     Indemnification of State Insulation................................................................42

6.10    Effect of Statutes of Limitation....................................................................43

ARTICLE 7 CONFIRMATION OF THE PLAN.....................................................43

7.1     Acceptance or Rejection of the Plan...............................................................43

7.2     Confirmation Hearing...............................................................................44

7.3     Requirements for Confirmation. ...................................................................45

7.4     Effect of Confirmation..............................................................................49

ARTICLE 8 RISKS OF THE PLAN..................................................................49

8.1     General...............................................................................................49

8.2     Confirmation Risks..................................................................................49

8.3     General Economic Conditions – Financial Performance........................................50

8.4     Variance from Reorganized State Insulation's Financial Projections. ........................50

8.5     Insurance Coverage for Asbestos Claims. ........................................................51

8.6     Distributions to Asbestos Claimants...............................................................51

8.7     Federal Income Tax Consequences of the Plan. .................................................51

8.8     Risk of Post-Confirmation Default. ...............................................................51

ARTICLE 9 ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
OF THE PLAN ............................................................................................52

   9.1   Liquidation Under Chapter 7. ......................................................52

   9.2   Alternative Plan of Reorganization..............................................52

ARTICLE 10 CERTAIN MATERIAL FEDERAL INCOME TAX
CONSEQUENCES OF THE PLAN............................................................53

   10.1   Tax Consequences to State Insulation. .......................................53

   10.2   Tax Consequences to Holders of Certain Claims. ......................57

   10.3   Tax Consequences to the Asbestos Trust....................................58

ARTICLE 11 FINANCIAL INFORMATION ...........................................59

   11.1   Generally...................................................................................59

   11.2   Reorganized State Insulation's Financial Projections................59

ARTICLE 12 SOURCES OF INFORMATION PROVIDED AND THE
ACCOUNTING METHOD USED..............................................................60

   12.1   Sources of Information ...............................................................60

   12.2   Accounting Method ...................................................................60

## INTRODUCTORY STATEMENT
## REGARDING VOTING PROCEDURES

State Insulation has sent Ballots with voting instructions and copies of this Disclosure Statement to all of its known holders of Claims who are in Classes impaired under the Plan. Holders of Claims should read the Ballot carefully and follow the voting instructions. Holders of Claims should only use the official Ballot that accompanies this Disclosure Statement.

In order to be counted for voting purposes, State Insulation's Balloting Agent must receive Ballots for the acceptance or rejection of the Plan no later than 5:00 p.m., Eastern Time, on [      ], 2011, at the following address:

> Lowenstein Sandler PC
> 65 Livingston Avenue
> Roseland, NJ  07068
> Attn:  Thomas A. Pitta, Esq.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, you should contact the Balloting Agent at 973-597-2370;  Facsimile:  973-597-2371;  E-mail:  tpitta@lowenstein.com.  If you have any questions about this Disclosure Statement, the Plan, or the procedures for voting on the Plan, you should contact your attorney or State Insulation's attorney, Jeffrey Prol, Esq. or Thomas A. Pitta, Esq., Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, NJ 07068, (Tel) 973-597-2500, (Fax) 973-597-2400.  However, if you have any other questions, you should contact your own attorney.

For detailed voting instructions, see the Bankruptcy Court order approving this Disclosure Statement and the voting instructions accompanying your Ballot.

## ARTICLE 1
## INTRODUCTION

Please consult the Glossary of Defined Terms for the Disclosure Statement and Chapter 11 Plan of Reorganization (the "Glossary"), a copy of which is attached to this Disclosure Statement as Exhibit B, for the meaning of defined terms.

1.1     <u>Filing of State Insulation's Chapter 11 Reorganization Case</u>.

On February 23, 2011 (the "Petition Date"), State Insulation filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). Since the Petition Date, State Insulation has operated its business and managed its properties as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

1.2     Purpose of the Disclosure Statement.

The purpose of this Disclosure Statement is to enable the holders of Claims against the Debtor to make an informed decision with respect to the Plan prior to their vote on the Plan. *This Disclosure Statement is not intended to replace careful review and analysis of the Plan.* Rather, it is submitted as an aid and supplement in your review of the Plan and is an effort to explain the terms and implications of the Plan on file with the Bankruptcy Court. Every effort has been made to explain fully the various aspects of the Plan as it may affect all creditors and holders of equity interests. If you have any questions, the Debtor urges you to contact counsel of your choice.

Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement in its entirety prior to voting on the Plan. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement and § 1125 of the Bankruptcy Code. No other party has been authorized to utilize any information concerning the Debtor or its business, other than the information contained in this Disclosure Statement, to solicit votes on the Plan. Holders of a Claim or Equity Interest should not rely on any information relating to the Debtor or its business, other than that contained in this Disclosure Statement and the exhibits attached hereto.

The Disclosure Statement does not constitute an offer of securities. The information contained in the Disclosure Statement has not been reviewed by the Securities and Exchange Commission or any other state securities commission. Furthermore, no commission has passed upon the accuracy or adequacy of the statements contained herein.

Any approval of the Disclosure Statement by the Bankruptcy Court does not constitute an endorsement by the Bankruptcy Court of the Plan or a guaranty of the accuracy and completeness of the information contained herein.

1.3     Hearing on Confirmation of the Plan.

The Bankruptcy Court will hold a hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of holders of Claims and whether the other requirements for Confirmation of the Plan have been satisfied. Once commenced, the Confirmation Hearing may be adjourned or continued by announcement in open court with no further notice. Holders of Claims against State Insulation may vote on the Plan by completing and delivering the enclosed Ballot to Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, NJ 07068, Attn: Thomas A. Pitta, Esq., on or before 5:00 p.m. Eastern Time on [ ], 2011. The procedures and requirements for voting on the Plan are described in more detail in the materials distributed with this Disclosure Statement.

1.4     Sources of Information.

Except as specifically noted, the information contained herein has not been subjected to an independent audit. Therefore, although the Debtor has reviewed and concurs with the presentation of information and has made every reasonable effort to be accurate in all material matters, State Insulation is unable to warrant or represent that all the information contained herein is without any inaccuracy.

The portions of this Disclosure Statement describing State Insulation, its business, assets, liabilities, and management, and the Plan have been derived from numerous sources including, but not limited to, State Insulation's books and records, schedules, loan agreements, and documents specifically identified herein.

Certain of the materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are digests of other documents. While State Insulation has made every effort to retain the meaning of such other documents or portions that have been summarized, State Insulation urges that any reliance on the contents of such other documents should depend on a thorough review of the documents themselves. In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of such document shall apply.

The authors of the Disclosure Statement have compiled information from State Insulation without professional comment, opinion, or verification and do not suggest comprehensive treatment has been given to matters identified herein. Each holder of a Claim or Equity Interest is urged to independently investigate any such matters prior to reliance.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified, and neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no change in the facts set forth herein since the date hereof.

No statements concerning State Insulation, its past or future operations, the value of its assets, or the Plan should be relied upon other than as set forth in this Disclosure Statement. In arriving at your decision, you should not rely on any representation or inducement made to secure your acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representations or inducements should be reported to counsel for State Insulation Corporation, Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, NJ 07068, (Tel) 973-597-2500, (Fax) 973-597-2400, Attn:  Jeffrey D. Prol, Esq. and Thomas A. Pitta, Esq.

NEITHER STATE INSULATION NOR ITS COUNSEL CAN WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS WITHOUT INACCURACY. NEITHER STATE INSULATION NOR ITS COUNSEL HAVE VERIFIED THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, ALTHOUGH THEY DO NOT HAVE ACTUAL KNOWLEDGE OF ANY INACCURACIES.

# ARTICLE 2
# EXPLANATION OF CHAPTER 11

2.1    <u>Overview of Chapter 11</u>.

Chapter 11 is the principal reorganization Chapter of the Bankruptcy Code. Pursuant to Chapter 11, a debtor-in-possession attempts to reorganize its business and financial affairs for the benefit of the debtor, its creditors, and other parties-in-interest.

The commencement of a Chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the petition is filed. Unless the bankruptcy court orders the appointment of a trustee, §§ 1107 and 1108 of the Bankruptcy Code provide that a Chapter 11 debtor may continue to operate its business and control the assets of its estate as a "debtor-in-possession."

The filing of a Chapter 11 petition also triggers the automatic stay, which is set forth in § 362 of the Bankruptcy Code. The automatic stay essentially halts all attempts to collect pre-petition claims from the debtor or to otherwise interfere with the debtor's business or its estate.

Formulation of a plan of reorganization is the principal purpose of a Chapter 11 case. The plan sets forth the means for satisfying the claims of creditors against and interests of equity security holders in the debtor. Unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a Chapter 11 case (the "Exclusive Period"). After the Exclusive Period has expired, a creditor or any other party-in-interest may file a plan, unless the debtor files a plan within the Exclusive Period. If a debtor files a plan within the Exclusive Period, the debtor is given sixty (60) additional days (the "Solicitation Period") to solicit acceptances of its plan. Section 1121(d) of the Bankruptcy Code permits the bankruptcy court to extend or reduce the Exclusive Period and the Solicitation Period upon a showing of adequate "cause."

2.2    <u>Plan of Reorganization</u>.

A plan of reorganization provides the manner in which a debtor will satisfy the claims of its creditors. After the plan of reorganization has been filed, the holders of claims against or interests in a debtor are permitted to vote on whether to accept or reject the plan. Chapter 11 does not require that each holder of a claim against or interest in a debtor vote in favor of a plan of reorganization in order for the plan to be confirmed. At a minimum, however, a plan of reorganization must be accepted by at least one class of claims impaired under the Plan, such acceptance being made by the holders of a majority in number and two-thirds in amount of the claims actually voting in such class. The Bankruptcy Code also defines acceptance of a plan of reorganization by a class of interests (equity securities) as acceptance by holders of two-thirds of the number of interests actually voted.

Classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and, thus, are not entitled to vote. Acceptances of the Plan in this case are being solicited only from those persons who hold Claims in an impaired Class. A Class is "impaired" if the legal, equitable, or contractual rights

attaching to the Claims or Equity Interests of that Class are modified. Modification does not include curing defaults and reinstating maturity or payment in full in cash.

Even if all classes of claims and interests accept a plan of reorganization, a bankruptcy court may nonetheless still deny confirmation. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and, among other things, the Bankruptcy Code requires that a plan of reorganization be in the "best interests" of creditors and shareholders and that the plan of reorganization be feasible. The "best interests" test generally requires that the value of the consideration to be distributed to claimants and interest holders under a plan may not be less than those parties would receive if that debtor were liquidated under a hypothetical liquidation occurring under Chapter 7 of the Bankruptcy Code. A plan of reorganization must also be determined to be "feasible," which generally requires a finding that there is a reasonable probability that the debtor will be able to perform the obligations incurred under the plan of reorganization, and that the debtor will be able to continue operations without the need for further financial reorganization.

A bankruptcy court may confirm a plan of reorganization even though fewer than all of the classes of impaired claims and interests accept it. In order for a plan of reorganization to be confirmed despite the rejection of a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan of reorganization does not discriminate unfairly and that the plan is fair and equitable with respect to each impaired class of claims or interests that has not accepted the plan of reorganization.

Under § 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class if, among other things, the plan provides: (a) that each holder of a claim included in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

The Bankruptcy Court must further find that the economic terms of the plan of reorganization meet the specific requirements of § 1129(b) of the Bankruptcy Code with respect to the particular objecting class. The proponent of the plan of reorganization must also meet all applicable requirements of § 1129(a) of the Bankruptcy Code (except § 1129(a)(8) if the proponent proposes to seek confirmation of the plan under the provisions of § 1129(b)). These requirements include the requirement that the plan comply with applicable provisions of the Bankruptcy Code and other applicable law, that the plan be proposed in good faith, and that at least one impaired class of creditors has voted to accept the plan.

2.3    <u>Confirmation of Plan</u>.

(a)    <u>Solicitation of Acceptances</u>.

State Insulation is soliciting your vote on its Plan. State Insulation will bear the cost of any solicitation by State Insulation. No other party shall receive any additional compensation for any solicitation other than as disclosed to the Bankruptcy Court.

**No representations or assurances, if any, concerning the Debtor (including, without limitation, its future business operations) or the Plan are authorized by the Debtor other than as set forth in this Disclosure Statement. Any representations or inducements made by any person to secure your vote that are other than herein contained should not be relied upon by you in arriving at your decision, and such additional representations or inducements should be reported to counsel for State Insulation for such action as may be deemed appropriate.**

**This is a solicitation solely by State Insulation and is not a solicitation by any shareholder, attorney, or accountant for State Insulation. The representations, if any, made herein are those of State Insulation and not of such shareholders, attorneys, or accountants, except as may be otherwise specifically and expressly indicated**.

Under the Bankruptcy Code, a vote for acceptance or rejection of a plan may not be solicited unless the claimant has received a copy of a disclosure statement approved by the Bankruptcy Court prior to, or concurrently with, such solicitation. This solicitation of votes on the Plan is governed by § 1125(b) of the Bankruptcy Code. Violation of § 1125(b) of the Bankruptcy Code may result in sanctions by the Bankruptcy Court, including disallowance of any improperly solicited vote.

2.4     Requirements for Confirmation of the Plan.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of § 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter an Order confirming the Plan. The requirements of § 1129 are discussed in further detail in Section 7.3 herein.

To obtain the Supplemental Injunction channeling Asbestos Claims to the Asbestos Trust pursuant to section 524(g) of the Bankruptcy Code, the Plan must also satisfy the requirements of that section of the Bankruptcy Code. State Insulation believes that the Plan satisfies all of the statutory requirements of the Bankruptcy Code and was proposed in good faith. State Insulation also believes it has complied or will have complied with all the requirements of the Bankruptcy Code as provided in Section 7.3 herein.

2.5     Acceptances Necessary to Confirm the Plan.

Voting on the Plan by each holder of a Claim entitled to vote is important. Chapter 11 of the Bankruptcy Code does not require that each holder of a Claim vote in favor of the Plan in order for the Court to confirm the Plan. Generally, to be confirmed under the acceptance provisions of § 1126(a) of the Bankruptcy Code, the Plan must be accepted by each Class of Claims that is impaired under the Plan by Class members holding at least two thirds (2/3) in dollar amount and more than one half (1/2) in number of the Allowed Claims of such

Class actually voting in connection with the Plan. Even if all Classes of Claims entitled to vote accept the Plan, the Bankruptcy Court may refuse to confirm the Plan.

In addition to the voting requirements under § 1126(a) of the Bankruptcy Code, State Insulation's Plan must receive affirmative votes from at least seventy-five percent (75%) of all Asbestos Claimants actually voting on the Plan in order to get the injunctions contemplated by § 524(g)(2)(B) of the Bankruptcy Code and described in Section 12 of the Plan. The Bankruptcy Court Order approving this Disclosure Statement provides that each holder of an Asbestos Claim in Class 4 shall be entitled to one vote, each of which will be assigned a value of one dollar ($1) for purposes of voting only.

2.6   Cramdown.

In the event that any impaired Class of Unsecured Claims or Equity Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity interests. "Fair and equitable" has different meanings for holders of secured and unsecured Claims and Equity Interests.

With respect to an unsecured claim, "fair and equitable" means either (i) each impaired creditor receives or retains property of a value equal to the amount of its allowed claim; or (ii) the holder of any claim or equity interest that is junior to the claims of the dissenting class will not receive any property under the Plan.

2.7   Overview of State Insulation's Plan of Reorganization.

The following is a summary of certain information contained elsewhere in this Disclosure Statement and in the Plan. The summary is necessarily incomplete and is qualified in its entirety by reference to the more detailed information appearing elsewhere in this Disclosure Statement, the exhibits hereto, and the Plan Documents. *This summary and overview of the Plan is to be used for reference purposes only and should not be read or relied upon in place of the detailed descriptions contained in the Plan and the attachments to the Plan.*

(a)   Classification and Treatment of Claims. In accordance with the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified under the Plan. The following list summarizes the classification of the Claims and Equity Interests under the Plan. For a detailed description of each Class, see Section 3 of the Plan.

(1)   Class 1 - Priority Claims Other Than Priority Tax Claims
(2)   Class 2 - Secured Claim of Prepetition Lender
(3)   Class 3 - Secured Claims Other Than Secured Claim of Prepetition Lender
(4)   Class 4 - Asbestos Claims
(5)   Class 5 - General Unsecured Claims Other Than Asbestos Claims
(6)   Class 6 - Equity Interests

As shown in the table below, holders of Administrative Expense Claims and Priority Tax Claims, and holders of Claims in Classes 1, 2, 3, 5 and 6 are unimpaired under the Plan. Class 4 is impaired within the meaning of § 1124 of the Bankruptcy Code and is entitled to vote on the Plan. All present and future Asbestos Claims (Class 4) will be channeled to the State Insulation Corporation Asbestos Trust (the "Asbestos Trust") for payment as and to the extent provided in the Trust Agreement and Trust Distribution Procedures (or "TDP"). For a detailed description of the treatment of the Classes of Claims, see Section 4.2 of the Plan and Section 5.2 herein. The Allowed Claims against State Insulation and their anticipated recoveries are estimated as follows:

|  | Estimated Number of Claims | Estimated Total Amount of Claims ($) | Estimated Recovery Percentage |
|---|---|---|---|
| Priority Tax Claims | 0 | $0 | 100% |
| Class 1 (Priority Claims Other Than Priority Tax Claims | 0 | $0 | 100% |
| Class 2 (Secured Claim of Prepetition Lender) | 1 | $500,000 | 100% |
| Class 3 (Secured Claims Other Than Secured Claim of Prepetition Lender) | 0 | $0 | 100% |
| Class 4 (Asbestos Claims) | Unknown | Unknown | Unknown[1] |
| Class 5 (General Unsecured Claims Other than Asbestos Claims) | 100 | $1,683,271.35 | 100% |
| Class 6 (Equity Interests) | 2 | N/A | Unimpaired |

(b)     Establishment of Asbestos Trust for Asbestos Claimants.

(1)     Establishment. The Plan provides that a trust will be established pursuant to the Trust Agreement, and funded by the Asbestos Trust Assets, for the benefit of holders of present and future Asbestos Claims. All Asbestos Claims will be channeled to the Asbestos Trust. The purpose of the Asbestos Trust is to (a) assume all liability for all Asbestos Claims, (b) preserve, hold, manage and maximize the Asbestos Trust Assets for use in paying and otherwise satisfying Asbestos Claims and paying the Asbestos Trust Expenses, (c) provide for the allowance or disallowance and, if appropriate, satisfaction of all Asbestos Claims in accordance with the TDP, and (d) otherwise comply in all respects with the requirements of a trust set forth in section 524(g) and related documents.  All Asbestos Claims shall be paid in accordance with the Trust Agreement and TDP.  The TDP shall be established and implemented by the Asbestos Trust as provided in the Trust Agreement.

---

[1]     At this time, the estimated recovery for Asbestos Claimants is unknown. See Section 3.3(a) herein for a description of known Asbestos Claims as of the Petition Date.

(2)    Asbestos Trust Assets: The Asbestos Trust will be funded with Asbestos Trust Assets assigned pursuant to the Plan which include, without limitation, Cash, the Trust Promissory Note and certain other assets more specifically described in Section 6.2 herein.

(c)    Treatment of Asbestos Claims: Present Asbestos Claims and future asbestos Demands will receive a payment equal to the Allowed liquidated value of the Claim multiplied by the then applicable Payment Percentage as determined by the Trustee in accordance with a document known as the Trust Distribution Procedures (the "TDP"), a form of which is attached as part of Exhibit 2 to the Plan.

Based upon State Insulation's knowledge of its current and future operations, current and future financial projections and current Asbestos Claims, and the general asbestos liabilities of similarly situated companies, it is anticipated that the Asbestos Trust will not be able to pay in full all Asbestos Claims as they are liquidated and will not be able to pay all Asbestos Claims in full over time. However, it can be stated with certainty that (a) State Insulation has committed substantial resources for the payment of Asbestos Claims; and (b) the mechanisms of the Asbestos Trust have been designed to provide reasonable assurance that the Asbestos Trust will value, and will be in a financial position to pay, similar present and future Allowed Asbestos Claims in substantially the same manner. The Asbestos Trust will be administered by the Trustee pursuant to the Trust Agreement and the procedures outlined in the TDP. See Section 5 of the Plan for further information regarding the Asbestos Trust.

(d)    Indemnification Under the Trust: As and to the extent provided in the Trust Agreement, the Asbestos Trust shall indemnify and hold harmless the Debtor, Reorganized State Insulation, the Released State Insulation Parties, the Trustee, any officers and employees of the Asbestos Trust, the Futures Representatives, each member of the TAC, and with regard to each of the foregoing, their respective past, present and future representatives for Asbestos Claims prosecuted against Reorganized State Insulation in violation of the Supplemental Injunction.

(e)    Reorganized State Insulation: State Insulation will reorganize its business operations as Reorganized State Insulation. Upon Confirmation of the Plan, the property of State Insulation will vest in Reorganized State Insulation free and clear of all claims, interests, and liens, except as otherwise provided in the Plan. As contemplated by the Plan substantially all the assets of Reorganized State Insulation may be pledged as collateral to secure exit financing after the Effective Date.

(f)    Injunctions: The Plan will permit the business of Reorganized State Insulation to operate free of asbestos-related claims and litigation, through the operation of the following injunctions pursuant to §§ 105, 524(g), and 1141 of the Bankruptcy Code:

(1)    Discharge Injunction: Reorganized State Insulation will be protected from all Claims, including present and future Asbestos Claims (Class 4) and General Unsecured Claims Other Than Asbestos Claims (Class 5), by State Insulation's discharge and the Discharge Injunction, which will prohibit and enjoin the taking of any legal action against State Insulation, Reorganized State Insulation and others based upon any such Claims. For a complete description of the Discharge Injunction, see Section 12.3 of the Plan.

(2)     Supplemental Injunction. The Plan provides for a supplemental injunction against certain actions commenced against State Insulation, Reorganized State Insulation, and its affiliates based upon any Asbestos Claim or Demand for injury or death allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products. For a complete description of the Supplemental Injunction, see Section 12.4 of the Plan.

(3)     Conditions Precedent: The issuance of the above-described Injunctions are conditions precedent to Confirmation of, and essential elements of, the Plan.

(g)     Authority: State Insulation believes that the Bankruptcy Court has the equitable jurisdiction and power under §§ 105, 524, and 1141 of the Bankruptcy Code, including, but not limited to, § 524(g) of the Bankruptcy Code, to enter the Injunctions.

(h)     Distributions: The proposed distributions to each Class of creditors are summarized in the table set forth in Section 2.7(a) above. In all instances, State Insulation's estimate of the amount of Claims assumes either consensual agreement with the holders of Disputed Claims or favorable determinations as to Disputed Claims.

## ARTICLE 3
## GENERAL INFORMATION

3.1     The Company; Corporate Structure; Management; and Debt Structure.

(a)     Business of State Insulation.

The Debtor was incorporated in 1961 as a distributor of insulation products and accessories for the installation of insulation.  The Debtor has never manufactured any products. The Debtor employs twenty-four people and its sales are focused in New York, New Jersey, Pennsylvania and certain foreign markets.  The Debtor delivers the products it sells using its own fleet of trucks and by common carriers, including shipping product overseas via steamship.

(b)     Management of State Insulation.

The following is a list of certain officers of State Insulation, their position and certain biographical information. Each officer of State Insulation will hold office following the Effective Date.

| Name | Position |
|---|---|
| George Lionikis, Sr. | President and Chairman of the Board |
| George Lionikis, Jr. | Treasurer and Chief Executive Officer |
| Irene Lionikis | Secretary |

George Lionikis, Sr.  Mr. Lionikis, Sr. founded State Insulation in 1961 and has been the principal since its formation.

George Lionikis, Jr.  Mr. Lionikis, Jr. has been employed by State Insulation since 1972, either directly or through a management agreement with Johnstone Management Company Inc.

       (c)     <u>Directors of State Insulation</u>.

The Directors of State Insulation are George Lionikis, Sr., George Lionikis, Jr. and Irene Lionikis.

       (d)     <u>Employees</u>.

       State Insulation operates a distribution facility in Perth Amboy, New Jersey. As of this date, it employs a workforce of approximately 23 employees. Certain of the employees are members of the International Brotherhood of Teamsters (the "Teamsters") and are covered by the terms of a collective bargaining agreement, which terminates on April 30, 2013. The collective bargaining agreement will be assumed by the Debtor on the Effective Date pursuant to the Plan.  State Insulation has a long history with the Teamsters and does not anticipate any unusual difficulties in negotiating a new contract upon such termination.

       (e)     <u>Summary and Structure of Existing Indebtedness, DIP and Exit Financing</u>.

       Prior to the Petition Date, State Insulation and JPMorgan Chase Bank, N.A. ("Chase") entered into a Business Loan Agreement dated July 23, 2010 (the "Chase Loan Agreement") pursuant to which Chase agreed to make available to State Insulation a line of credit (the "Chase Loan") of up to $1,500,000, limited to an amount supported by a borrowing base consisting of certain eligible accounts and eligible inventory (as more particularly described in the Chase Loan Agreement).  In connection with the Chase Loan, State Insulation executed and delivered to Chase a promissory note dated July 23, 2010 (the "Chase Note"), pursuant to which State Insulation promised to pay to Chase the principal sum of $1,500,000, or so much thereof as borrowed by State Insulation under the Chase Loan Agreement, together with interest thereon at a variable rate based on the LIBOR Rate, calculated on a 360-day year, with all unpaid principal, interest, and other charges due in full on July 23, 2011.  Pursuant to the Chase Loan Agreement, the State Insulation's obligations under the Chase Loan were secured by all inventory, chattel paper, accounts, equipment and general intangibles of State Insulation including, (a) all accessions, attachments, accessories, tools, parts, supplies, replacements and additions to any of the foregoing, (b) all products and produce of any of the foregoing, (c) all accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease or other disposition of any of the foregoing, (d) all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the foregoing, and sums due from a third party who has damaged or destroyed any of the foregoing, whether due to judgment, settlement or other process, and (e) all records and data relating to any of the foregoing, whether in the form of writing, photograph, microfilm, microfiche, or electronic media, together with Chase's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.  In addition, in connection with the Chase Loan, George Lionikis, Sr. ("Lionikis Sr.") executed and delivered to Chase a Commercial Guaranty under which he guaranteed State Insulation's obligations under the Chase Note.

       On February 11, 2011, I&G  Lending, LLC ("I&G") purchased the Chase Loan from Chase and State Insulation and I&G entered into an Amended and Restated Loan Agreement (the "I&G Loan Agreement") pursuant to which I&G agreed to make loans of up to $1,500,000 to State Insulation, subject to the terms and conditions of the I&G Loan Agreement.

Pursuant to the I&G Loan Agreement, State Insulation's obligations under the I&G Loan Agreement are secured by all personal property and fixtures of State Insulation whether presently existing or existing in the future or presently owned or acquired in the future by State Insulation and whether or not subject to the Uniform Commercial Code, including, but not limited to, all goods, money, instruments, accounts, farm products, inventory, equipment, documents, chattel paper, investment property, deposit accounts, supporting obligations and general intangibles, and all interest, dividends and other distributions thereon paid and payable in cash or property, and all replacements and substitutions for, all accessions and additions to, and all products and proceeds of, all of the foregoing (the "Prepetition Collateral").   As of the Petition Date, the principal balance due under the I&G Loan Agreement was $500,000 (the "Prepetition Indebtedness").

(1)   <u>Interim DIP Financing Order</u>. By interim order of the Bankruptcy Court dated February 24, 2011, State Insulation, as debtor-in-possession, was authorized to obtain a revolving credit loan from I&G (in such capacity, the "DIP Lender") of up to $1,000,000 in excess of the Pre-Petition Financing. The DIP Lender was granted a first-priority lien on substantially all of State Insulation' assets, subject only to

(i)   the prepetition liens having priority over the Prepetition Lender as of the Petition Date;

(ii)   the pre-petition liens of I&G; and

(iii)   the carve-out for fees of the United States Trustee and professionals retained in the case. The right to borrow under the line of credit is set to expire on June 30, 2011.

By Final Order of the Bankruptcy Court dated March 23, 1022, State Insulation, as debtor-in-possession, was authorized to increase the amount of the post-petition borrowing up to $1,000,000 in excess of the Pre-Petition Financing.

The DIP Lender may be reinstated and serve as Reorganized State Insulation's exit financing lender after the Plan Effective Date.

3.2   <u>Equity Structure</u>.

State Insulation has 100 shares of Common Stock.   George Lionikis, Sr. owns 99 shares and Irene Lionikis owns one share.   Pursuant to the Plan, upon the Effective Date the shareholders shall retain their interests in Reorganized State Insulation.

3.3   <u>Factors Leading to the Need for Bankruptcy Relief</u>.

(a)   <u>Asbestos Claims</u>.

From the State Insulation's formation through 1977 it distributed many different insulation products, a small percentage of which contained asbestos as an ingredient.   For the most part, manufacturers ceased using asbestos in insulation products by 1972, however, two products State Insulation distributed continued to contain asbestos for some time thereafter.   The Debtor sold a very limited quantity of those two products.

State Insulation was named as a defendant in an asbestos case for the first time in 1978. Throughout the eighties and nineties, the claims continued to come in, although State Insulation was able to have many cases dismissed as a result of State Insulation's production of evidence demonstrating it had not sold asbestos containing products to the claimant's employers or jobsite. The number of claims filed against State Insulation has declined significantly since 1998. In 1998, 384 claims were filed; in 2009, there were only 39 filed. There are currently approximately 90 asbestos-related actions pending against State Insulation.

At the rate the asbestos claims were being filed against and being settled by State Insulation and its insurance carrier, it appeared that State Insulation would be able to address all of the claims through the insurance currently in place and, after exhaustion of the insurance proceeds, with cash flow from operations. However, in recent years, there has been an increase in the number of mesothelioma claims, which often result in larger settlements than other asbestos-related claims. Up until 2009, with over 5000 claims either settled or dismissed, State Insulation had only paid a handful of settlements in excess of $100,000, but in 2009 State Insulation had to settle a single claim for $525,000. As of the Petition Date, there were a number of mesothelioma cases that are scheduled for trial or likely to be in the near future.

While there are fewer and fewer defendants as time passes, the claims have become much larger and State Insulation will be unable to sustain the defense of the remaining and anticipated claims out of the remaining insurance or cash flow, particularly in light of the decline in the State Insulation's operating revenues that began in 2009 and is expected to continue for the foreseeable future.

(b)    State Insulation's Insurance Coverage for Asbestos-Related Bodily Injury Claims.

(1)    General Discussion of Coverage.

State Insulation's records indicate that, at least as early as 1967, State Insulation began purchasing insurance to protect itself from liability to third parties injured by its activities, including, but not limited to, activities relating to the sale of insulation products. Generally, such policies also would obligate the insurers to pay defense costs in connection with claims against State Insulation, in addition to any otherwise applicable limits of liability of the policies. Beginning in 1984, such liability policies typically had an exclusion for coverage of asbestos-related claims. State Insulation has only a limited number of Asbestos Insurance Policies that remain with coverage that has not been exhausted, as described below.

During the many years that State Insulation has been named as a defendant in asbestos cases, the cases were defended under the supervision of State Insulation's insurers and State Insulation, under the belief it had sufficient insurance coverage to satisfy its asbestos liability, performed little oversight of the handling of the claims by the insurers. In October 2010, State Insulation was informed that only $1,240,000 in insurance coverage remained available for the defense and payment of these asbestos claims.

Based upon its review of the policies at issue and other secondary evidence, State Insulation believes that it is entitled to a substantial amount of additional insurance coverage for which it does not have copies of the applicable policies. In addition,

State Insulation also believes that the exhaustion analysis performed by its insurers was incorrect for a number of reasons, including the failure to apply full policy limits to each separate coverage period for certain multi year policies. Claims that State Insulation may make for additional insurance coverage may be impacted by the fact that one of the insurers against which State Insulation would have substantial claims recently filed for rehabilitation under the laws of the State of New York.

### 3.4    Pre-Bankruptcy Negotiations

As the prospect of onerous asbestos litigation, awards, and settlements increased, State Insulation became concerned about its ability to continue in business and to pay fair compensation to claimants injured by its historical operations. Accordingly, State Insulation conferred with counsel regarding ways to compensate legitimate asbestos claimants fairly while preserving the company's business, including utilization of the special provisions of the Bankruptcy Code, such as § 524(g).

(a)    Representatives of Certain Asbestos Claimants.

In approximately October 2010, State Insulation and its legal counsel entered into discussions with counsel for certain of the known Asbestos Claimants regarding State Insulation's desire to create a trust and obtain the injunctive relief available under § 524(g) of the Bankruptcy Code. State Insulation sought to negotiate a pre-arranged plan of reorganization that would address the Asbestos Claims and preserve its business. Among the firms participating in such discussions were: (a) Wilentz, Goldman & Spitzer, P.A., 90 Woodbridge Center Drive, Suite 900 Box 10, Woodbridge, NJ 07095-0958; (b) Cohen, Placitella & Roth, PC, 127 Maple Avenue, Red Bank, NJ 07001 and (c) Levy Phillips & Konigsberg, LLP, 800 Third Avenue, 11th Floor, New York, NY 10022. State Insulation believes the clients represented by such firms comprise the majority of asbestos personal injury claimants with Claims against State Insulation.

(b)    Selection of the Legal Representative.

State Insulation engaged the services of an individual to represent the interests of all Future Asbestos Claimants because of the potential for conflict between the Future Asbestos Claimants and those Asbestos Claimants holding claims which accrued before the Confirmation Date.

After considering potential candidates, the Debtor determined that Mr. Edward Bond of Bederson & Company LLP was well qualified to serve as a FCR. In particular, Mr. Bond has over 40 years of experience handling bankruptcy matters. During the last decade, a significant portion of Mr. Bond's work has focused on serving as the financial advisor to future claimants representatives in large asbestos bankruptcy cases. Bederson previously served as the financial advisor to the future claimants representative in the bankruptcy cases of *Federal-Mogul Global Inc.*, Case No. 01-10578 (AMW) (Bankr. D. Del.); *G-I Holdings, Inc.*, Case No. 01-30135 (RG) (Bankr. D.N.J.); *Global Industrial Technologies, Inc.*, Case No. 02-21626 (JKF) (Bankr. W.D. Pa. 2002); *North American Refractories Co.*, Case No. 02-20198 (JKF) (Bankr. W.D. Pa.); *ACandS, Inc.*, Case No. 02-12687 (JKF) (Bankr. D. Del.). In addition, Bederson is currently serving as the accountant to the section 524(g) trusts in the bankruptcy cases of *Congoleum Corp.*, Case No. 03-51524 (KCF) (Bankr. D.N.J.); *Burns & Roe Enterprises, Inc.*,

Case No. 00-41610 (RG) (Bankr. D.N.J.); *T H Agriculture & Nutrition, LLC*, Case No. 08-14692 (REG) (Bankr. S.D.N.Y.); *Plibrico Co.*, Case No. 02-09952 (JHS) (Bankr. N.D. Ill.); Artra Group, Inc., Case No. 02-21522 (BSH) (Bankr. N.D. Ill.).  Through these prior engagements. Mr. Bond has (a) engaged in negotiations concerning the creation and funding of various channeling trusts that will cause millions of dollars in cash and insurance proceeds to be available for payment of present and future asbestos claimants; (b) participated in settlement conferences concerning insurance and plan issues; and (c) negotiated trust distribution procedures and related documents.

     3.5    <u>Filing of Reorganization Case</u>.

        Pre-petition, the law firms referenced above and Mr. Bond were given information concerning State Insulation, its financial position, insurance assets, and Asbestos Claims. Thereafter, the parties commenced discussions regarding a settlement of the Asbestos Claims pursuant to a plan of reorganization, relying upon § 524(g) of the Bankruptcy Code to develop a process for the resolution of Asbestos Claims against State Insulation.

        Following the extensive negotiations, State Insulation was able to reach an agreement with Mr. Bond as well as Wilentz, Goldman & Spritzer, PA, the representatives of the majority of the existing holders of Asbestos Claims, which agreed on behalf of one of its clients, on the terms of a plan of reorganization pursuant to which State Insulation and certain affiliated persons would contribute assets to a trust in exchange for an injunction pursuant to § 524(g) of the Bankruptcy Code channeling all Asbestos Claims to such trust.  The Plan incorporates the terms of the agreement reached pre-petition and State Insulation anticipates that the requisite number of holders of Asbestos Claims will vote to accept the Plan.

# ARTICLE 4
# OPERATIONS DURING THE REORGANIZATION CASE

     4.1    <u>Commencement of the Reorganization Case</u>.

        On the Petition Date, State Insulation filed its voluntary petition for reorganization under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of New Jersey.

     4.2    <u>Administration of the Reorganization Case</u>.

     (a)    <u>First Day Relief</u>

        At the beginning of the Reorganization Case, State Insulation filed a number of motions (collectively, the "First Day Motions") to ensure a seamless transition between State Insulation's prepetition and postpetition business operations. In essence, these motions sought Bankruptcy Court approval for normal business conduct that may not be specifically authorized under the Bankruptcy Code, or as to which the Bankruptcy Code requires prior approval. After conducting a hearing on February 24, 2011, the Bankruptcy Court entered several orders granting the First Day Motions. The relief granted by the Bankruptcy Court in the First Day Motions is summarized below.

     (b)    DIP Financing Order

By interim order dated February 24, 2011 and Final Order entered on April 18, 2011, State Insulation, as Debtor-in-Possession, was authorized to obtain a revolving credit loan from the DIP Lender of up to $1,000,000 in addition to the $500,000 that had been borrowed pre-petition. The DIP Lender was granted a first-priority priming lien on substantially all of State Insulation' assets, subject only to (a) the prepetition liens having priority over the Prepetition Lender as of the Petition Date, and (b) the carve-out for fees of the United States Trustee and professionals retained in the case. The right to borrow under the DIP loan is set to expire on June 30, 2011.

Cash Management Order. State Insulation was authorized to maintain its existing bank accounts and to operate its cash management system substantially as it existed prior to the Petition Date.

Employee Wage Order. State Insulation was given authority to pay prepetition employee wages, salaries, benefits and other obligations in the ordinary course of business. Pursuant to such authorization, State Insulation paid all Priority Claims for wages, salaries, benefits, and other obligations. Accordingly, there are currently no such Priority Claims outstanding.

Utility Order. The Court established procedures to ensure that utilities could not terminate service to State Insulation on account of unpaid prepetition invoices. The procedures also address requests for additional adequate assurance by utility companies during the pendency of the Reorganization Case.  As of the date hereof, there are no such requests outstanding.

    4.3    Professionals and Committees.

     (a)    State Insulation Professionals.

State Insulation has retained several professionals to assist it with various functions related to the Reorganization Case. On March 21, 2011, the Bankruptcy Court authorized the retention of Lowenstein Sandler PC as counsel for State Insulation under a general retainer. State Insulation also retained the firm of JH Cohn LLP as its financial advisor.

     (b)    Creditors' Committee and Professionals.

The United States Trustee appointed the Official Committee of Unsecured Asbestos Claimants (the "Creditors' Committee") on March 10, 2011. The Creditors' Committee consists of the following members: (i) James McGowan (represented by Wilentz Goldman & Spitzer); (ii) Gary R. Chavan (represented by Cohen Placitella & Roth, LLP); and (c) Thomas Borodynko (represented by Wysoker, Glassner, Weingartner, Gonzalez & Lockspeiser LLP).

The Bankruptcy Court authorized the retention of the following professionals by the Creditors' Committee: (a) Greenbaum Rowe Smith & Davis LLP (counsel) and (b) Legal Analysis Systems, Inc. (asbestos-related bodily injury consultant).

(c)  <u>Legal Representative for Future Asbestos Personal Injury Claimants</u>.

In order to confirm a plan of reorganization implementing a channeling injunction under § 524(g) of the Bankruptcy Code, it is necessary to appoint a legal representative for the purpose of protecting the rights of persons who might in the future assert asbestos-related demands. By order entered April 19, 2011, Edward Bond was appointed as the legal representative for the future holders of Asbestos Claims against State Insulation. Mr. Bond was further authorized to retain the following professionals: (a) Saiber LLC (legal counsel); and (b) Legal Analysis Systems, Inc. (asbestos-related bodily injury consultant).

4.4  <u>Claims Process</u>.

(a)  <u>Non-Asbestos Claims</u>.

On March 18, 2011, State Insulation filed its Schedules of assets and liabilities (the "Schedules"), identifying those parties that may have claims against the bankruptcy estate based upon the internal records of State Insulation. State Insulation reserves the right to amend the Schedules from time to time.

State Insulation listed approximately 100 Claims (other than Asbestos Claims) on the Schedules. State Insulation has been engaged in reviewing and reconciling the Claims filed. In the event State Insulation disputes the nature or amount of an asserted Claim, State Insulation will either seek a stipulated resolution with the affected creditor, or it will file an objection to the creditor's Claim with the Bankruptcy Court.

(b)  <u>Payment of Claims</u>.

In order to preserve its relationships with vendors, and in light of the fact that General Unsecured Claims Other than Asbestos Claims were to be unimpaired under the Plan, on March 1, 2011 State Insulation filed a Motion with the Bankruptcy Court seeking authority to pay its trade creditors in the ordinary course of business.  On March 14, 2011, the Bankruptcy Court entered an order approving the Motion and authorizing the Debtors to pay unsecured trade creditors.  As a result of the entry of such order, the Debtor anticipates that substantially all prepetition unsecured claims will be paid in advance of the Effective Date.

(c)  <u>Administrative Bar Date</u>.

It is anticipated that the Confirmation Order will establish the Administrative Expense Claims Bar Date. Unless otherwise ordered by the Bankruptcy Court, State Insulation expects the Administrative Expense Claims Bar Date to be the first Business Day that is at least forty-five (45) days after the Effective Date.

4.5  <u>Exclusivity</u>.

Under § 1121 of the Bankruptcy Code, a debtor has the exclusive right to (a) file a plan of reorganization during the first 120 days of its chapter 11 case and (b) solicit acceptances of such a plan during the first 180 days of the case. These periods may be extended for "cause." State Insulation currently has the exclusive right to file a plan of reorganization through June 22,

2011, and it has the exclusive right to solicit acceptances of such a plan through August 21, 2011. State Insulation reserves the right to request extensions of the exclusivity periods.

      4.6     <u>Preferences and Fraudulent Conveyance Actions</u>.

      Section 13.8 of the Plan provides that, except as otherwise provided in the Plan, Reorganized State Insulation shall be vested with, and have the right to enforce against any Entity, any and all of State Insulation's causes of action, which includes the right to bring preference and fraudulent conveyance actions against certain parties pursuant to §§ 546, 547, and 548 of the Bankruptcy Code. State Insulation does not intend to pursue any preferential or fraudulent conveyance actions.

**ARTICLE 5**
**DISCUSSION OF THE PLAN**

      5.1     <u>Classification</u>.

      (a)     <u>General</u>. Section 3 of the Plan sets forth a designation of Classes of Claims and Interests and an explanation of Claims that are not classified under the Plan. Pursuant to § 1122 of the Bankruptcy Code, a Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of the Class, and a Claim or Interest is classified in a different Class to the extent the Claim or Interest qualifies within the description of that different Class.

      (b)     <u>Unclassified Claims</u>. In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified and are excluded from the Classes established in Article 3 of the Plan. The treatment accorded Administrative Expense Claims and Priority Tax Claims is set forth in Article 2 of the Plan.

      (c)     <u>Bar Date for Claims</u>. The Bankruptcy Court set July 25, 2011 as the Bar Date for all Claims. Reorganized State Insulation may review and object to such Claims, other than Asbestos Claims, within one hundred twenty (120) days after the later of: (a) the Effective Date, or (b) the date on which such Claim was filed with the Bankruptcy Court; provided, however, that such one hundred twenty (120) day period of review may be extended by the Bankruptcy Court upon the request of the Debtor or Reorganized State Insulation.

      (d)     <u>Bar Date for Asbestos Claims</u>. While the Bankruptcy Court established a Bar Date with respect to all Claims, including Asbestos Claims, Asbestos Claims are being channeled to the Asbestos Trust and shall be liquidated in accordance with the Trust Agreement and the TDP. Neither the Debtor nor the Asbestos Trust shall be entitled to assert the Bar Date as a defense to any Asbestos Claim.

      (e)     <u>Classes</u>. For purposes of the Plan, the Claims against, and Interests in, State Insulation are grouped in the following Classes in accordance with § 1122(a) of the Bankruptcy Code:

        Class 1 - Priority Claims Other Than Priority Tax Claims
        Class 2 – Secured Claim of Prepetition Lender

Class 3 – Secured Claims Other Than Secured Claim of Prepetition Lender

Class 4 – Asbestos Claims

Class 5 – General Unsecured Claims Other Than Asbestos Claims

Class 6 – Equity Interests

Class 4 is impaired within the meaning of § 1124 of the Bankruptcy Code and is therefore entitled to vote to accept or reject the Plan. All other Classes of Claims and Interests are unimpaired within the meaning of § 1124 of the Bankruptcy Code and are deemed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code.

5.2    Satisfaction of Claims and Interests.

(a)    General. Allowed Claims and Allowed Interests, as classified in Article 3 of the Plan, shall be treated in the manner set forth in Article 4 of the Plan.

(b)    Administrative Expense Claims and Priority Tax Claims.

(1)    Administrative Expense Claims. An Administrative Expense Claims Bar Date shall be established for the first Business Day that is at least forty-five (45) days after the Effective Date, and notice of this date will be given to all applicable parties. Unless otherwise agreed by the proper parties, each holder of an Allowed Administrative Expense Claim shall receive Cash equal to the unpaid portion of such Allowed Administrative Expense Claim on the later of (a) the Distribution Date or as soon as practicable thereafter, (b) the Allowance Date, or (c) such other date as is mutually agreed upon by State Insulation and the holder of such Claim; provided, however, that Allowed Administrative Expense Claims representing (a) post-petition liabilities incurred in the ordinary course of business by State Insulation or (b) post-petition contractual liabilities arising under loans or advances to State Insulation, whether or not incurred in the ordinary course of business, shall be paid by Reorganized State Insulation in accordance with the terms and conditions of the particular transactions relating to such liabilities and any related agreements. A claimant's receipt of the Allowed Amount of its Administrative Expense Claim shall be in full satisfaction, settlement, release, extinguishment, and discharge of such Claim, on the Distribution Date.

(2)    Priority Tax Claims. Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by State Insulation prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Priority Tax Claim, in Cash on the Distribution Date.

(c)    Classified Claims and Interests. The following constitutes the treatment under the Plan of the various classes of Allowed Claims and Allowed Equity Interests:

(1)    Class 1 – Priority Claims Other Than Priority Tax Claims.

Class 1 Claims consists of all Priority Claims that are entitled to priority under § 507(a) of the Bankruptcy Code (other than Priority Claims under § 507(a)(8) which are treated as set forth in Article 2.3 above).  State Insulation believes that there are no Allowed

-19-

Class 1 Claims that have not previously been paid in full with the approval of the Bankruptcy Court.

        (A)     <u>Impairment and Voting</u>.

Class 1 is unimpaired by the Plan. Each holder of an Allowed Priority Claim in Class 1 is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan under § 1126 of the Bankruptcy Code.

        (B)     <u>Treatment</u>.

On the Distribution Date, each holder of a Class 1 Allowed Priority Claim not previously paid in full shall receive either (A) the Allowed Amount of its Priority Claim, in Cash, or (B) such other, lesser treatment as may be agreed to in writing by such holder and Reorganized State Insulation.

        (2)     <u>Class 2 – Secured Claim of Prepetition Lender</u>.

The Prepetition Lender is the holder of an Allowed Secured Claim equal to the outstanding balance of its Credit Facility (see Section 3.1(e)(4) herein).

        (A)     <u>Impairment and Voting</u>.

Class 2 is unimpaired by the Plan and is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan under § 1126 of the Bankruptcy Code.

        (B)     <u>Treatment</u>.

Except to the extent the Prepetition Lender agrees to different treatment, and notwithstanding any contractual provisions or applicable non-bankruptcy law that entitles the Prepetition Lender to demand or receive payment of its Allowed Secured Claim prior to its stated maturity from and after the occurrence of any default, Reorganized State Insulation shall reinstate the debt underlying such Allowed Secured Claim and leave the collateral for such debt in place.

        (3)     <u>Class 3 – Secured Claims Other Than Secured Claim of Prepetition Lender</u>.

Class 3 consists of all Secured Claims against the Debtor that are not a Class 2 Claim.  The Debtor does not believe there are any Class 3 Claims.

        (A)     <u>Impairment and Voting</u>.

Class 3 is unimpaired by the Plan. Each holder of an Allowed Class 3 Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan under § 1126 of the Bankruptcy Code.

(B)    <u>Treatment</u>.

Except to the extent holders of Allowed Class 3 Claims agree to different treatment, and notwithstanding any contractual provisions or applicable non-bankruptcy law that entitles a holder of an Allowed Class 3 Claim to demand or receive payment of its Allowed Secured Claim prior to its stated maturity from and after the occurrence of any default, Reorganized State Insulation shall at its option take one of the following actions with respect to such allowed Secured Claim: (a) reinstate the debt underlying such allowed Secured Claim and leave the collateral for such debt in place; (b) distribute the collateral securing such allowed Secured Claim to the holder thereof in satisfaction of such Claim; or (c) distribute Cash in an amount equal to the net proceeds actually received from the sale, pursuant to Section 363(b) of the Bankruptcy Code, of any collateral securing such Allowed Secured Claim.

(4)    <u>Class 4 –Asbestos Claims</u>.

Class 4 consists of all Asbestos Claims against the Debtor.

(A)    <u>Impairment and Voting</u>.

Class 4 is impaired by the Plan. Each holder of an Asbestos Claim is entitled to vote to accept or reject the Plan under §§ 524(g) and 1126 of the Bankruptcy Code without the requirement of filing a motion for allowance of such claims for voting purposes pursuant to Bankruptcy Rule 3018(a)  .

(B)    <u>Treatment</u>.

As of the Effective Date, all liability for all present and future Asbestos Claims against the Debtor shall be automatically and without further act or deed channeled to the Asbestos Trust and shall be payable as and to the extent provided in the Trust Agreement and the TDP (see Exhibit 2 attached to the Plan). Reorganized State Insulation shall have no liability for such Claims and Demands. See Article 5 of the Plan.

(5)    <u>Class 5 – General Unsecured Claims Other Than Asbestos Claims</u>.

Class 5 consists of holders of general unsecured claims that are neither Asbestos Claims nor entitled to priority under the Bankruptcy Code.

(A)    <u>Impairment and Voting</u>.

Class 5 is unimpaired by the Plan. Each holder of an Allowed Class 5 Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan under § 1126 of the Bankruptcy Code.

(B)    <u>Treatment</u>.

To the extent such claim has not previously been paid in full, each holder of an Allowed Class 5 Claim shall receive, in full and final satisfaction of its Allowed Class 5 Claim, payment in full of its Allowed Class 5 Claim on the date that such Claim would have been due in the ordinary course of the Debtor's business.

(6)      Class 6 – Equity Interests.

Lionikis, Sr. holds 99 shares of State Insulation's common stock.  Irene Lionikis owns the remaining 1 share.

(A)      Impairment and Voting.

Class 6 is unimpaired by the Plan. The holder is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan under § 1126 of the Bankruptcy Code.

(B)      Treatment.

On the Effective Date, the holders of the Equity Interests shall retain their Equity Interests in exchange for the contribution of those Asbestos Trust Assets that are not property of the Debtor.

5.3      Means for Execution of the Plan.

(a)      Establishment of the Trust. On the Effective Date, the Asbestos Trust shall be established in accordance with the Trust Agreement (see Exhibit 2 attached to the Plan) and as further described in Article 6 herein, and funded with the Asbestos Trust Assets.

(b)      Asbestos Trust Funding.

On the Effective Date, or as soon as practicable thereafter, Reorganized State Insulation shall transfer the Asbestos Trust Assets, including (a) the $1,300,000 Trust Promissory Note, (b) the Collateral Pledge of an account or accounts containing liquid assets securing the Trust Promissory Note and (c) Cash in the amount of $350,000 to the Asbestos Trust as part of the consideration to be paid by the Debtor to the Asbestos Trust for the Asbestos Trust's assumption of Asbestos Claims against the Debtor.  Thereafter, as further consideration for the Asbestos Trust's assumption of Asbestos Claims against the Debtor, Reorganized State Insulation shall pursue any Asbestos Insurance Action with respect to the Asbestos Insurance Policies against any Asbestos Insurance Company that is not a Settling Asbestos Insurance Company, provided, however, Reorganized State Insulation shall pay the first $150,000 of the Litigation Costs, the Asbestos Trust shall be responsible for payment of the next $150,000 of Litigation Costs, and Reorganized State Insulation and the Trust shall each be responsible for 50% of any Litigation Costs in excess of $300,000.  Reorganized State Insulation shall be entitled to select the professionals of its choice to prosecute any Asbestos Insurance Action, subject to the consent of the Asbestos Trust, such consent not to be unreasonably withheld. Reorganized State Insulation shall be entitled to reimbursement of any Litigation Costs paid by it from the proceeds of any Asbestos Insurance Actions.  Reorganized State Insulation shall transfer to the Asbestos Trust, all net proceeds of the Asbestos Insurance Action, after repayment of the Litigation Costs incurred by State and the satisfaction of all legal fees and expenses. Article 5.2 provides for the transfer of the Asbestos Trust Assets.

(c)      Certificate of Incorporation and Bylaws. The Certificate of Incorporation of Reorganized State Insulation shall, as of the Effective Date, be amended in its entirety and the

Bylaws of Reorganized State Insulation shall be amended as necessary to effectuate the terms of this subparagraph. Consistent with § 1123(a)(6) of the Bankruptcy Code and the terms of the Plan, the amended Certificate of Incorporation of Reorganized State Insulation shall, at any time that the Trust Promissory Note remains unpaid, among other things, (a) prohibit the issuance of non-voting equity securities as part of the Reorganization Case; and (b) authorize the issuance of additional shares of the Reorganized Debtor's common stock in an amount sufficient to satisfy any obligations upon a payment Event of Default under the Trust Promissory Note, with such shares to be held as treasury stock pending further notice.

(d)    Management of Reorganized State Insulation.  On and after the Effective Date, a board of directors consisting of George Lionikis, Sr., George Lioinkis, Jr. and Irene Lionikis will manage the business and affairs of Reorganized State Insulation.  Pursuant to the Plan, a representative of the Trust will be entitled to observe meetings of the board of directors while the Trust Promissory Note remains outstanding.

(e)    Plan Distributions.

(1)    General. Reorganized State Insulation shall make all distributions required under the Plan on account of Allowed Claims that are not Asbestos Claims as of the Distribution Date at any of the following addresses: (a) the address set forth on the Proof of Claim filed by such holder; or (b) if no Proof of Claim has been filed, at the address reflected in the list of Creditors filed with the Bankruptcy Court in the Schedules, if such Schedules are filed.

(2)    Distributions of Cash. Any payment or distribution of Cash made by Reorganized State Insulation pursuant to the Plan shall be made by check or wire transfer, at the option of Reorganized State Insulation.

(3)    Timing of Distributions.  Distributions shall be made as provided in Articles 2 and 4 (or as soon as practicable thereafter unless otherwise provided herein or ordered by the Bankruptcy Court) with respect to all Claims except for Asbestos Claims.

(4)    Distributions by the Trust. Distributions to holders of Asbestos Claims shall be made by the Asbestos Trust in accordance with the Trust Agreement, the TDP and such other applicable agreements, documents or instruments relating thereto that are not inconsistent with the terms of the Trust Documents.

(5)    Undeliverable or Unclaimed Distributions.

(A)    Holding and Investment of Undeliverable Property. If the distribution to the holder of any Claim is returned to Reorganized State Insulation as undeliverable, no further distribution shall be made to such holder unless and until Reorganized State Insulation is notified in writing of such holder's then current address. Subject to the provision described below, undeliverable distributions shall remain in the possession of (and need not be invested by) Reorganized State Insulation until such time as a distribution becomes deliverable.

(B)    Distribution of Undeliverable Property After It Becomes Deliverable and Failure to Claim Undeliverable Property. Any holder of an Allowed Non-

Asbestos Claim who does not assert a claim for an undeliverable distribution held by Reorganized State Insulation within six (6) months after the Effective Date shall no longer have any claim to or interest in such undeliverable distribution, and shall be forever barred from receiving any distributions under the Plan.

(6)     De Minimis Distributions. No Cash payment of less than twenty-five dollars ($25.00) shall be made to any holder on account of an Allowed Claim unless a request is made in writing to Reorganized State Insulation.

(f)     Disputed Claims.

(1)     Disallowance of Improperly Filed Claims. Subject to § 502(j) of the Bankruptcy Code and Bankruptcy Rules 3008 and 9006, any Administrative Expense Claim or Non-Asbestos Claim for which the filing of a Proof of Claim or motion with the Bankruptcy Court is required under the terms of the Bankruptcy Code, the Bankruptcy Rules, any order of the Bankruptcy Court (including one providing a Bar Date), or the Plan shall be disallowed if and to the extent that such Proof of Claim (or other filing) is not timely and properly made.

(2)     Prosecution of Objections. Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the Debtor or Reorganized State Insulation, as the case may be, shall have the exclusive right to make and file objections to Proofs of Claims, other than Proofs of Claims in respect of Asbestos Claims, or to object to any Claims specified on the Schedules at any time on or before one hundred twenty (120) days after the later of (i) the Effective Date or (ii) the date on which such Claim was filed with the Bankruptcy Court unless no Proof of Claim is required to be filed pursuant to Bankruptcy Rule 3002, the Plan, or any order of the Bankruptcy Court; provided, however, that: (x) this deadline may be extended by the Bankruptcy Court on motion by the Debtor or Reorganized State Insulation, as applicable, and (y) neither the Debtor, Reorganized State Insulation, nor any other Person may file an objection to any Claim that was Allowed by a Final Order entered during the chapter 11 case, or Claim Allowed by the Plan.  The exclusive rights granted herein include the right of Reorganized State Insulation to litigate to judgment, settle, or withdraw such objections after the Effective Date.

After the Effective Date, solely the Asbestos Trust shall have authority to file objections to Asbestos Claims and litigate to judgment, settle, or withdraw such objections and each Allowed Asbestos Claim, whether or not a Proof of Claim was filed with the Bankruptcy Court, shall be satisfied exclusively in accordance with the Trust Documents.

(3)     No Distributions Pending Allowance. If a Claim or any portion of a Claim is disputed, no payment or distribution shall be made on account of the disputed portion of such Claim (or the entire Claim, if the entire Claim is disputed), unless and until such Disputed Claim becomes an Allowed Claim.

(g)     Further Authorizations. The Debtor, Reorganized State Insulation, the Creditors' Committee, and/or the Legal Representative, if and to the extent necessary, may seek such orders, judgments, injunctions, and rulings that any of them deem necessary to further carry out the intentions and purposes and give full effect to the provisions of the Plan.

(h)     Transfer Taxes. The issuance, transfer, or exchange of any of the securities issued under, or the transfer of any other assets or property pursuant to or in connection with the Plan or the making or delivery of an instrument of transfer under or in connection with the Plan shall not, pursuant to § 1146 of the Bankruptcy Code, be taxed under any law imposing a stamp tax, transfer tax or other similar tax.

(i)     Recordable Order. Upon Confirmation of the Plan, the Confirmation Order shall be deemed to be in recordable form, and shall be accepted by any recording officer for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

(j)     Effectuating Documents and Further Transactions. The Chief Executive Officer, President, or any Vice President of the Debtor shall be authorized to execute, deliver, file or record such contracts, instruments, releases, indentures, and other agreements or documents and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Secretary or any Assistant Secretary of the Debtor shall be authorized to certify or attest to any of the foregoing actions.

(k)     Corporate Action. All matters provided for under the Plan involving the corporate structure of the Debtor or Reorganized State Insulation, or any corporate action to be taken by, or required of the Debtor or Reorganized State Insulation, shall be deemed to have occurred and be effective as provided in the Plan, and shall be authorized and approved in all respects without any requirement for further action by the stockholders or directors of any of such entities.

5.4     Conditions to Plan Confirmation and Conditions to Effectiveness of the Plan.

(a)     Conditions to Confirmation. Confirmation of the Plan shall not occur unless each of the following conditions has been satisfied or waived, in writing, by the Debtor. These conditions to Confirmation, which are designed, among other things, to ensure that the Injunctions, releases, and discharges set forth in Article 12 of the Plan shall be effective, binding and enforceable, are as follows:

(1)     Findings of Fact. The Bankruptcy Court shall have made specific findings and determinations, among others, in substantially the following form:

(A)     As of the Petition Date, the Debtor has been named as a defendant in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(B)     The Asbestos Trust, upon the Effective Date, shall assume the liabilities of the Debtor with respect to Asbestos Claims;

(C)     The Asbestos Trust is to be funded in part by the Trust Promissory Note which constitutes an obligation of the Debtor to make future payments to the Trust;

(D)     The Asbestos Trust, on the Effective Date, will be entitled to hold fifty and 1/10 percent (50.1%) of the issued and outstanding voting shares of Reorganized State Insulation as provided by the terms of the Trust Promissory Note in the event of a default;

(E)     The Asbestos Trust is to use its assets and income to pay Asbestos Claims and Asbestos Trust Expenses;

(F)     The Debtor is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos Claims, which are addressed by the Supplemental Injunction;

(G)     The actual amounts, numbers and timing of future Demands cannot be determined;

(H)     Pursuit of Demands outside the procedures prescribed by the Plan is likely to threaten the Plan's purpose to deal equitably with Asbestos Claims;

(I)     The terms of the Discharge Injunction and Supplemental Injunction, including any provisions barring actions against third parties, are set out in the Plan and in the Disclosure Statement;

(J)     Pursuant to Court orders or otherwise, the Asbestos Trust shall operate through mechanisms such as structured, periodic or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos Claims or other comparable mechanisms, as set forth in the Trust Agreement and TDP, that provide reasonable assurance that the Asbestos Trust shall value, and be in a financial position to pay Asbestos Claims in substantially the same manner;

(K)     The Legal Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Discharge Injunction and Supplemental Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that are addressed in the Discharge Injunction and Supplemental Injunction and transferred to the Asbestos Trust;

(L)     In light of the benefits provided, or to be provided, to the Asbestos Trust on behalf of each Released Party, the Supplemental Injunction is fair and equitable with respect to the persons that might subsequently assert Demands against any Released Party;

(M)     The Plan otherwise complies with § 524(g) of the Bankruptcy Code;

(N)     The terms of the Plan do not violate any obligation of the Debtor or breach any applicable insurance policy, agreement, or contract of the Debtor, including, without limitation, any obligations or duties to cooperate, any consent-to assignment provisions, or any consent-to settlement provisions under any insurance policies, contracts or agreements; and

(O)    Nothing in the Plan or the Plan Documents operates to, or has the effect of, impairing any insurer's legal, equitable, or contractual rights under the Asbestos Insurance Policies in any respect. The rights of insurers shall be determined according to the terms of the Asbestos Insurance Policies, as applicable.

(2)    <u>Confirmation Order</u>. The Confirmation Order shall provide that on the Effective Date the Discharge Injunction shall issue and be implemented in connection with the Plan, and the Supplemental Injunction shall issue and be implemented in connection with the Asbestos Trust, and the Bankruptcy Court shall have made such findings and determinations regarding the Plan, including that the Plan was proposed in good faith, as shall enable the entry of the Confirmation Order, and any other order entered in conjunction therewith, in form and substance acceptable to the Debtor.

(b)    <u>Conditions to Effectiveness</u>. Notwithstanding any other provision of the Plan or the Confirmation Order, the Effective Date of the Plan shall not occur unless and until each of the following conditions has been satisfied or, if applicable, waived:

(1)    <u>Disclosure Statement</u>. The Bankruptcy Court shall have approved the Disclosure Statement;

(2)    <u>Confirmation Order</u>. The Confirmation Order, including the Discharge Injunction and Supplemental Injunction, shall have been issued or affirmed by the District Court, and shall have become a Final Order and remain in full force and effect; provided, however, that the Effective Date may occur at a point in time when the Confirmation Order is not a Final Order at the sole option of the Debtor, unless the effectiveness of the Confirmation Order has been stayed or vacated, in which case the Effective Date may be, again at the sole option of the Debtor, the first Business Day immediately following the expiration or other termination of any stay of effectiveness of the Confirmation Order; provided, however, that the conditions set forth in Section 10.2(b) of the Plan may be waived by the Debtor;

(3)    <u>Plan Documents</u>. The Plan Documents necessary or appropriate to implement the Plan shall have been executed, delivered, and where applicable, filed with the appropriate governmental authorities; provided, however, that the conditions set forth in Section 10.2(c) of the Plan may be waived by the Debtor;

(4)    <u>United States Trustee's Fees</u>. The fees of the United States Trustee then owing by the Debtor shall have been paid in full; and

(5)    <u>Tax Assurances</u>. The Debtor shall have obtained either (i) a private letter ruling from the Internal Revenue Service establishing that the Trust is a "qualified settlement fund" pursuant to § 468(B) of the IRC and the regulations issued pursuant thereto, or (ii) other decisions, opinions, or assurances regarding certain tax consequences of the Plan, deemed satisfactory by the Debtor, Reorganized State Insulation, the Creditors' Committee, and the Legal Representative.

(6)    <u>Exit Financing</u>. On the Effective Date, Reorganized State Insulation will have received a commitment effective on the Effective Date, for a line of credit in

an amount not less than $1,500,000 and otherwise reasonably satisfactory to Reorganized State Insulation.

(c)     Waiver of Conditions. The Debtor may waive the conditions set forth above at any time, without notice to any parties in interest other than the Creditors' Committee and the Legal Representative, both of whom shall be notified in writing, without leave of or order of the Court, and without any formal action other than proceeding to consummate the Plan.

5.5     Effects of Plan Confirmation.

(a)     Binding Effect.

(1)     The Plan shall be binding upon the Debtor and all present and former holders of Claims and Interests (regardless of whether such holders agree to the Plan or whether such Claims or Interests are impaired under the Plan), and their respective successors and assigns, including Reorganized State Insulation.

(b)     Exoneration and Reliance. The Debtor, Reorganized State Insulation, the Creditors' Committee, and the Legal Representative, as well as their respective stockholders, directors, officers, agents, employees, members, attorneys, accountants, financial advisors, and representatives, shall not be liable other than for willful misconduct to any holder of a Claim or Interest or any other Entity with respect to any action, omission, forbearance from action, decision or exercise of discretion taken at any time prior to the Effective Date in connection with: (a) the management or operation of the Debtor or Reorganized State Insulation, or the discharge of their duties under the Bankruptcy Code; (b) the implementation of any of the transactions provided for, or contemplated in, the Plan or the Plan Documents; (c) any action taken in connection with either the enforcement of the Debtor's rights against any Entity or the defense of Claims asserted against the Debtor with regard to the Reorganization Case; (d) any action taken in the negotiation, formulation, development, proposal, disclosure, Confirmation or implementation of the Plan Documents filed in this Reorganization Case; or (e) the administration of the Plan or the Asbestos Trust or the Asbestos Trust Assets and property to be distributed pursuant to the Plan.

The Debtor, Reorganized State Insulation, the Creditors' Committee and the Legal Representative, as well as their respective stockholders, directors, officers, agents, employees, members, attorneys, accountants, financial advisors, and representatives may reasonably rely upon the opinions of their respective counsel, accountants, and other experts or professionals and such reliance, if reasonable, shall conclusively establish good faith and the absence of willful misconduct; provided, however, that a determination that such reliance is unreasonable shall not, by itself, constitute a determination or finding of bad faith or willful misconduct. In any action, suit, or proceeding by any holder of a Claim or Interest or any other Entity contesting any action by, or non-action of, the Debtor, Reorganized State Insulation, the Creditors' Committee or the Legal Representative, or their respective stockholders, directors, officers, agents, employees, members, attorneys, accountants, financial advisors and representatives, the reasonable attorneys' fees and costs of the prevailing party shall be paid by the losing party and, as a condition to going forward with such action, suit, or proceeding at the outset thereof, all parties thereto shall be required to provide appropriate proof and assurances of

their capacity to make such payments of reasonable attorneys' fees and costs in the event they fail to prevail.

        (c)      <u>Injunctions, Releases and Discharge</u>.

        (1)      <u>Discharge and Release</u>. Except as specifically provided in the Plan or in the Confirmation Order, effective on the Effective Date, Confirmation shall: (a) discharge the Debtor and Reorganized State Insulation in and from any and all Claims (including Asbestos Claims) and Demands, including any Claim of a kind specified in § 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such Claim was filed or deemed filed under § 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of the Debtor, (ii) such Claim is or was Allowed under § 502 of the Bankruptcy Code, or (iii) the holder of such Claim has voted on or accepted the Plan; and (b) preserve all rights and interests of the holders of Equity Interests in respect of the Debtor or Reorganized State Insulation, for the purposes of and subject to the terms of the Plan. Except as specifically provided in the Plan to the contrary, the rights that are provided in the Plan shall be in complete (x) discharge of all Claims (including Asbestos Claims) and Demands against, Liens on, and Interests in the Debtor and Reorganized State Insulation (other than the Equity Interests in Class 6), (y) discharge and release of all Claims constituting Released Claims, including but not limited to all causes of action, whether known or unknown, either directly or derivatively through the Debtor or Reorganized State Insulation against the Released Non-Debtor Parties and the Released State Insulation Parties on the same subject matter as any of the Claims, Liens, or Interests described in subpart (x) of this Section 5.5(a)(1), and (z) discharge and release of all causes of action of the Debtor or Reorganized State Insulation, whether known or unknown, including but not limited to all Claims, including the Released Claims, against the Released Non-Debtor Parties and the Released State Insulation Parties. Further, but in no way limiting the generality of the foregoing, except as otherwise specifically provided in the Plan, any Entity accepting any distributions or rights pursuant to the Plan shall be presumed conclusively to discharge Reorganized State Insulation and to have released the Released Non-Debtor Parties from (a) the Released Claims and (b) any other cause of action based on the same subject matter as the Claim or Interest on which the distribution or right is received. However, the Plan shall not discharge or release any claim or demand of the Debtor, Reorganized State Insulation, the Asbestos Trust, or any Asbestos Claimant against any Asbestos Insurance Company other than a Settling Asbestos Insurance Company (to the extent provided in the applicable settlement agreement with such Settling Asbestos Insurance Company approved by the Bankruptcy Court).

        (2)      <u>Discharge Injunction</u>. Except as specifically provided in the Plan Documents to the contrary, the satisfaction, release, and discharge set forth in Section 12.2 of the Plan shall also operate as an injunction, pursuant to §§ 105, 524(g), and 1141 of the Bankruptcy Code, prohibiting and enjoining the commencement or continuation of any action, the employment of process, or any act to collect, recover from, or offset (a) any Claim (including Asbestos Claims) or Demand against or Interest (other than the Equity Interests in Class 6) in the Debtor or Reorganized State Insulation by any Entity and (b) any cause of action, whether known or unknown, against the Released Parties based on the same subject matter as any Claim or Interest described in subpart (a) of this Section 5.5(a)(2).

        (3)      <u>The Supplemental Injunction</u>. In order to supplement the injunctive effect of the Discharge Injunction, and pursuant to § 524(g) or 105(a) of the Bankruptcy Code

(or both), the Confirmation Order shall provide for the following Supplemental Injunction to take effect as of the Effective Date:

        (A)    <u>Terms</u>. In order to preserve and promote the settlements contemplated by and provided for in the Plan and to supplement, where necessary, the injunctive effect of the discharge both provided by §§ 1141 and 524 of the Bankruptcy Code and as described in Article 12 of the Plan and above in this Section 5.5(a) and pursuant to the exercise of the equitable jurisdiction and power of the Bankruptcy Court and the District Court under § 524(g) or 105(a) of the Bankruptcy Code (or both), all Entities which have held or asserted, which hold or assert, or which may in the future hold or assert any Claim, Demand, or cause of action (including, but not limited to, any Asbestos Claim, any Released Claim, or any Claim or Demand for or respecting any Asbestos Trust Expense) against the Released Parties (or any of them) based upon, relating to, arising out of, or in any way connected with any Released Claim or Asbestos Claim whenever and wherever arising or asserted (including, but not limited to, all such Claims in the nature of or sounding in tort, contract, warranty or any other theory of law, equity or admiralty) or Interest shall be permanently stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Claim, Demand, cause of action or Interest, including, but not limited to:

        (i)    commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim, Demand, cause of action, or Interest against any of the Released Parties, or against the property of any Released Party with respect to any such Claim, Demand, cause of action, or Interest;

        (ii)    enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree, or order against any of the Released Parties or against the property of any Released Party with respect to any such Claim, Demand, cause of action or Interest;

        (iii)    creating, perfecting, or enforcing any Lien of any kind against any Released Party or the property of any Released Party with respect to any such Claim, Demand, cause of action or Interest;

        (iv)    except as otherwise specifically provided in the Plan, asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind against any obligation due any Released Party or against the property of any Released Party with respect to any such Claim, Demand, cause of action, or Interest; and

        (v)    taking any act, in any manner, in any place whatsoever, against any of the Released Parties or their property, that does not conform to, or comply with, the provisions of the Plan Documents or the Trust Documents relating to such Claim, Demand, cause of action, or Interest.

        (B)    <u>Reservations</u>. Notwithstanding anything to the contrary above, the Supplemental Injunction shall not enjoin:

(i)     the rights of Entities to the treatment accorded them under Articles 2, 3, and 4 of the Plan, as applicable, including the rights of Entities with Asbestos Claims to assert such Asbestos Claims in accordance with the TDP;

(ii)     the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Asbestos Trust Expenses against the Asbestos Trust; or

(iii)     the rights of Reorganized State Insulation to prosecute any Asbestos Insurance Action.

(4)     Reservation of Rights. Notwithstanding any other provision of the Plan to the contrary, the satisfaction, release, and discharge, and the Injunctions set forth in Sections 12.2, 12.3, and 12.4 of the Plan, respectively, shall not serve to satisfy, discharge, release, or enjoin claims by Reorganized State Insulation or any other Entity, as the case may be, against (a) the Asbestos Trust for payment of Asbestos Claims in accordance with the TDP; or (b) the Asbestos Trust for the payment of Asbestos Trust Expenses. Furthermore, notwithstanding anything to the contrary above, the Discharge Injunction and the Supplemental Injunction shall not enjoin any action taken or to be taken by the holder of an Allowed Secured Claim (including any action which would otherwise be prohibited by subparts (a)(1) through (5) of Section 12.4 of the Plan) to enforce its Allowed Secured Claim, or to perfect its Liens and security interests in its collateral, provided that the Holders of Allowed Secured Claims shall not be entitled to a Lien or security interest in the Asbestos Trust Assets. As further provided in Section 12.5 of the Plan, nothing in the Plan discharges, releases, or precludes: (i) any environmental liability to the United States that is not a Claim, (ii) any environmental Claim of the United States arising on or after the Confirmation Date; (iii) any environmental liability to the United States on the part of the Debtor or Reorganized Debtor as the owner or operator of real property after the Confirmation Date; or (iv) any environmental liability to the United States on the part of any Person other than the Debtor or Reorganized Debtor.

(5)     Disallowed Claims and Interests. On and after the Effective Date, the Debtor shall be fully and finally discharged from any liability or obligation on a disallowed Non-Asbestos Claim, and any order creating a disallowed Non-Asbestos Claim that is not a Final Order as of the Effective Date solely because of an Entity's right to move for reconsideration of such order pursuant to § 502 of the Bankruptcy Code or Bankruptcy Rule 3008. Disallowance of such Non-Asbestos Claims shall nevertheless become and be deemed to be a Final Order on the Effective Date.  The Confirmation Order, except as otherwise provided herein, or unless the Bankruptcy Court orders otherwise, shall constitute an order: (a) disallowing all Claims (other than Asbestos Claims) and Interests (other than the Equity Interests in Class 6) to the extent such Claims and Interests are not allowable under any provision of § 502 of the Bankruptcy Code, including, but not limited to, time-barred Claims, and Claims for unmatured interest, and (b) disallowing or subordinating, as the case may be, any Claims, or portions of Claims, for penalties or Non-Compensatory Damages.

(d)     Authority for Injunction. State Insulation believes that the Bankruptcy Court has the jurisdiction and power under §§ 105 and 524(g) of the Bankruptcy Code to enter the Injunctions.

(e)    Continuation of Certain Procedures and Effects of Certain Orders and Discontinuation of Others.

(1)    Term of Certain Injunctions and Automatic Stay.

(A)    All of the injunctions and/or automatic stays provided for in or in connection with the Reorganization Case, whether pursuant to §§ 105, 362, 524(g), or any other provision of the Bankruptcy Code or other applicable law in existence immediately prior to Confirmation shall remain in full force and effect until the Injunctions become effective, and thereafter if so provided by the Plan, the Confirmation Order, or by their own terms. In addition, on and after Confirmation, the Debtor may seek such further orders as it may deem necessary to preserve the status quo during the time between Confirmation and the Effective Date.

(B)    Each of the Discharge Injunction and Supplemental Injunction shall become effective on the Effective Date and shall continue in effect at all times thereafter. Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by the Injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

(2)    Institution and Maintenance of Legal and Other Proceedings. As of the Effective Date the Asbestos Trust shall be empowered to initiate, prosecute, defend, and resolve all legal actions and other proceedings related to any asset, liability, or responsibility of the Asbestos Trust. The Asbestos Trust shall be empowered to initiate, prosecute, defend, and resolve all such actions in the name of the Debtor and/or Reorganized State Insulation if deemed necessary or appropriate by the Trustee with the consent and approval the Legal Representative. The Asbestos Trust shall be responsible for the payment of all damages, awards, judgments, settlements, expenses, costs, fees, and other charges incurred subsequent to Confirmation arising from or associated with any legal action or other proceeding that is the subject of Section 13.6 of the Plan and shall pay or reimburse all deductibles, retrospective premium adjustments, or other charges that may arise from the receipt of insurance proceeds by the Asbestos Trust. Reorganized State Insulation shall be empowered to initiate, prosecute, defend, settle, and resolve all Asbestos Insurance Actions, and to maintain, administer, preserve, or pursue the Asbestos Insurance Policies and any settlement agreements with the Asbestos Insurance Companies and/or Settling Asbestos Insurance Companies. Notwithstanding anything to the contrary in Section 13.6 of the Plan, nothing in Section 13.6 of the Plan creates, modifies, or eliminates any right, duty, or obligation addressed, resolved, or released pursuant to the Plan.

(3)    Vesting and Enforcement of Causes of Action. Pursuant to §1123(b)(3)(B) of the Bankruptcy Code, except as otherwise provided in the Plan, Reorganized State Insulation shall be vested with and have the right to enforce against any Entity any and all of State Insulation's causes of action (including the right to pursue such claims, if any, in the name of the Debtor if necessary), with the proceeds of the recovery of any such actions, other than Asbestos Insurance Actions, to be deposited in Reorganized State Insulation; the net proceeds of any Asbestos Insurance actions or settlements thereof, shall be deposited in the Asbestos Trust; provided, however, that nothing in the Plan shall alter, amend, or modify the injunctions (including the Discharge Injunction and Supplemental Injunction), releases, or discharges provided in the Plan.

(f)     <u>Moratorium, Injunction, and Limitation of Recourse for Payment</u>.  Except as otherwise provided in the Plan or by subsequent order of the Bankruptcy Court, the Confirmation Order shall provide, among other things, that from and after the Confirmation Date, all Persons or entities who have held, hold, or may hold Claims and Interests (other than the Equity Interests in Class 6) against the Debtor are permanently enjoined from taking any of the following actions against the Estate, Reorganized State Insulation, the Released State Insulation Parties, the Creditors' Committee, the individual members of the Creditors' Committee, or the Legal Representative, or any of their property on account of any such Claims and Interests: (i) commencing or continuing, in any manner or in any place, any administrative, civil or criminal action or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, injunction or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability, or obligation due to the Debtor other than through a proof of claim or adversary proceeding; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan.

(g)     <u>Revesting</u>.  Except as otherwise expressly provided in the Plan, on the Effective Date, Reorganized State Insulation shall be vested with all of the assets and property of its former Estate, free and clear of all Claims, Liens, charges and other interests of holders of Claims, and may operate its business free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Court.

(h)     <u>No Successor Liability</u>.  Except as otherwise expressly provided in the Plan, the Debtor, Reorganized State Insulation, the Released State Insulation Parties, the Creditors' Committee, and the Legal Representative do not, pursuant to the Plan or otherwise, assume, agree to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtor relating to or arising out of the operations of or assets of the Debtor, whether arising prior to, on, or after the Confirmation Date. Neither the Debtor, Reorganized State Insulation, the Released State Insulation Parties, nor the Asbestos Trust is, or shall be, a successor to the Debtor by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that Reorganized State Insulation, and the Asbestos Trust shall assume the obligations specified in the Plan and the Confirmation Order.

(i)     <u>Disallowance of Contingent, Unliquidated or Disputed Indirect Asbestos Claims</u>. Unless the Bankruptcy Court orders otherwise, Confirmation shall constitute an order of the Bankruptcy Court pursuant to the authority granted by § 502(e)(1)(B) of the Bankruptcy Code, disallowing all contingent, unliquidated, or disputed Indirect Asbestos Claims.

5.6     <u>Treatment of Executory Contracts, Unexpired Leases and Settlements</u>.

(a)     <u>Assumption of Unexpired Leases and Executory Contracts</u>. Effective on the Effective Date, all pre-petition executory contacts and unexpired leases to which the Debtor is a party shall be deemed assumed, except for any executory contract or unexpired lease that (i) has been assumed or rejected pursuant to a Final Order, or (ii) is the subject of a pending motion for authority to assume or reject contracts or leases filed by the Debtor prior to the

Confirmation Date. Assumption by the Debtor shall constitute assumption by Reorganized State Insulation as the successor to the Debtor.

The Debtor believes that there is no cure amount in accordance with § 365(b)(1) of the Bankruptcy Code for any unexpired lease or executory contract to be assumed. Unless the non-debtor party timely objects and asserts such an amount within thirty (30) days of the Confirmation Date, the Confirmation of the Plan shall constitute consent to the approval of the assumption of its executory contract or unexpired lease and a determination that no cure amount is required under § 365(b)(1) of the Bankruptcy Code. In the event a party timely objects and asserts that a cure amount is due, the Reorganized Debtor shall attempt to resolve the dispute, and if a resolution is not reached within thirty (30) days of the objection, shall submit the dispute to the Bankruptcy Court for resolution pursuant to Section 6.2(b) of the Plan.

Those executory contracts and unexpired leases that the Debtor entered into after the Petition Date, to the extent such contract or lease is executory or unexpired, respectively, under § 365 of the Bankruptcy Code, are to be assumed under the Plan.

(b)     Damages Upon Rejection. The Bankruptcy Court shall determine the dollar amount, if any, of the Claim of any Entity seeking damages by reason of the rejection of any executory contract or unexpired lease; provided, however, that such Entity must file a Proof of Claim with the Bankruptcy Court before the expiration of thirty (30) calendar days following the Confirmation Date. To the extent that any such Claim is Allowed by the Bankruptcy Court by Final Order, such Claim shall become, and shall be treated for all purposes under the Plan, as a Class 5 Claim, or if the Claim is an Asbestos Claim, a Class 4 Claim, and the holder thereof shall receive distributions as a holder of an Allowed Claim in such Class pursuant to the Plan. The Debtor shall notify those Entities that may assert a Claim for damages from the rejection of an executory contract or unexpired lease of this bar date for filing a Proof of Claim in connection therewith.

5.7     Effectuation and Supervision of the Plan.

(a)     Jurisdiction. The Bankruptcy Court shall retain the fullest and most extensive jurisdiction permissible, including that necessary to ensure that the purposes and intent of the Plan are carried out. Except as otherwise provided in the Plan, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against the Debtor, and to adjudicate and enforce all other causes of action which may exist on behalf of the Debtor. Nothing contained herein shall prevent the Debtor, Reorganized State Insulation, or the Asbestos Trust from taking such action as may be necessary in the enforcement of any cause of action which the Debtor has or may have and which may not have been enforced or prosecuted by the Debtor, which cause of action shall survive Confirmation of the Plan and shall not be affected thereby except as specifically provided herein.

(b)     General. Following the entry of the Confirmation Order, the administration of the Chapter 11 Reorganization Case will continue at least until the completion of the transfers contemplated to be accomplished on the Effective Date. Moreover, the Asbestos Trust shall be subject to the continuing jurisdiction of the Bankruptcy Court and District Court in accordance with the requirements of § 468B of the IRC and the Treasury regulations issued pursuant thereto. The Bankruptcy Court shall also retain jurisdiction for the purpose of

classification of any Claim and the re-examination of Claims that have been allowed temporarily for purposes of voting, and the determination of such objections as may be filed with the Bankruptcy Court with respect to any Claim. The failure of the Debtor to object to, or examine, any Claim for the purposes of voting, shall not be deemed a waiver of the right of the Debtor, Reorganized State Insulation, or the Asbestos Trust to object to or re-examine such Claim in whole or part for any other purpose.

(1)     Specific Purposes. In addition to the foregoing, the Bankruptcy Court shall retain jurisdiction for the following specific purposes after Confirmation:

(A)     to modify the Plan after Confirmation, pursuant to the provisions of the Bankruptcy Code and the Bankruptcy Rules;

(B)     to correct any defect, cure any omission, reconcile any inconsistency, or make any other necessary changes or modifications in or to the Plan, the Trust Documents or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan Documents in the event that the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

(C)     to assure the performance by the Debtor, Reorganized State Insulation and the Trustee of their respective obligations to make distributions under the Plan;

(D)     to enforce and interpret the terms and conditions of the Plan Documents;

(E)     to enter such orders or judgments, including, but not limited to, injunctions (i) as are necessary to enforce the title, rights, and powers of the Debtor, Reorganized State Insulation, the Asbestos Trust, and the Legal Representative and (ii) as are necessary to enable holders of Claims to pursue their rights against any Entity that may be liable therefor pursuant to applicable law or otherwise, including, but not limited to, Bankruptcy Court orders;

(F)     to hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters with respect to the Debtor, Reorganized State Insulation or the Asbestos Trust arising on or prior to the Effective Date, arising on account of transactions contemplated by the Plan Documents, or relating to the period of administration of the Reorganization Case;

(G)     to hear and determine all applications for compensation of professionals and reimbursement of expenses under §§ 330, 331, or 503(b) of the Bankruptcy Code;

(H)     to hear and determine any causes of action arising during the period from the Petition Date through the Effective Date;

(I)     to hear and determine any cause of action in any way related to the Plan Documents or the transactions contemplated thereby, against the Debtor,

Reorganized State Insulation, the Creditors' Committee, the Asbestos Trust, the Trustee, or the Legal Representative and their respective officers, directors, stockholders, employees, members, attorneys, accountants, financial advisors, representatives, and agents;

(J)     to hear and determine any and all motions pending as of Confirmation for the rejection, assumption, or assignment of executory contracts or unexpired leases and the allowance of any Claim resulting therefrom;

(K)     to hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(L)     to consider and act on the compromise and settlement of any Non-Asbestos Claim against or Interest in the Debtor or its Estate including, without limitation, any disputes relating to the Administrative Expense Claims Bar Date and the Bar Date;

(M)     to hear and determine all questions and disputes regarding title to the assets of the Debtor, its Estate, or the Asbestos Trust;

(N)     to hear and determine all matters, questions, and disputes with respect to direct causes of action brought by the Asbestos Trust or Reorganized State Insulation, including, without limitation, extra-contractual causes of action against the Asbestos Insurance Companies;

(O)     to hear and determine any other matters related to the Plan, including the implementation and enforcement of all orders entered by the Bankruptcy Court in this Reorganization Case;

(P)     to retain continuing jurisdiction with regard to the Asbestos Trust sufficient to satisfy the requirements of § 468B of the IRC and Treas. Reg. Section 1.468B¬1(c)(1);

(Q)     to hear and determine any and all applications brought by the Trustee with the consent of the Legal Representative (to the extent required by the Trust Agreement) to amend, modify, alter, or repeal any provision of the Trust Agreement; and

(R)     to enter such orders as are necessary to implement and enforce the Injunctions and the other injunctions described herein, including, without limitation, orders extending the protections afforded by § 524(g) to the Settling Asbestos Insurance Companies.

5.8     Insurance Neutrality.

(a)     No Preclusion from Asserting Claims.

Nothing in the Plan, in any of the Plan Documents, or in the Confirmation Order will preclude any Entity (other than a Settling Asbestos Insurance Company) from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any of the Asbestos Insurance Policies, except claims, defenses,

rights or causes of action held by an insurer that are based on or arise out of any "anti-assignment" provision(s) in such policies. Subject to the foregoing, and the provisions of Sections 11.2(b) and (c) of the Plan, nothing in any of the Plan Documents, or in the Confirmation Order will waive any claims, defenses, rights, or causes of action that any Entity (other than a Settling Asbestos Insurance Company) has or may have under the provisions, terms, conditions, defenses, and/or exclusions contained in the Asbestos Insurance Policies, including (but not limited to) any and all such claims, defenses, rights, or causes of action based upon or arising out of any Asbestos Claim that is liquidated, resolved, discharged, channeled, or paid in connection with the Plan.

(b)    No Impairment of Rights.

Notwithstanding anything to the contrary in any of the Plan Documents or in the Confirmation Order, nothing in the Plan Documents or the Confirmation Order (including any other provision that purports to be preemptory or supervening) will in any way operate to, or have the effect of, impairing any Asbestos Insurance Company's legal, equitable, or contractual rights under the Asbestos Insurance Policies in any respect other than the enforcement of any "anti-assignment" provision(s) in such policies. Subject to the foregoing, the rights of insurers shall be determined according to the terms of the Asbestos Insurance Policies, as applicable.

(c)    No Assertion of Preclusion, etc.

Notwithstanding anything to the contrary in any of the Plan Documents or in the Confirmation Order, under no circumstances will any Entity (except as provided in a settlement agreement involving a Settling Asbestos Insurance Company) be permitted to assert issue preclusion or claim preclusion, waiver, estoppel, consent, or any other legal, or equitable theory against any insurer under any Asbestos Insurance Policy as to the existence, enforceability, or amount of any Asbestos Claim or Demand on the basis of the submission, valuation, resolution and/or payment of any Asbestos Claim by the Asbestos Trust. The submission of an Asbestos Claim by a claimant, and the valuation, resolution and/or payment of an Asbestos Claim by the Asbestos Trust shall be wholly without prejudice to any and all rights of the parties in all other contexts or forums, and shall not be deemed (unless otherwise determined by a Court of competent jurisdiction) to be a triggering event for liability under any Asbestos Insurance Policy.

(d)    Successor to the Debtor for Asbestos Claims.

The Asbestos Trust is, and shall be deemed to be, for all purposes, including, but not limited to, for purposes of insurance and indemnity, the successor to the Debtor in respect of Asbestos Claims. An Allowed Asbestos Claim shall be, and be deemed to be, a judgment against the Asbestos Trust (as successor for all purposes to the liabilities of the Debtor in respect of Asbestos Claims) in the Allowed Amount of such Asbestos Claim.

5.9    Miscellaneous Provisions.

The Plan provides certain miscellaneous terms, including those described in this Section 5.8.

(a)  Revocation of Plan. The Debtor reserves the right to revoke and withdraw the Plan before the entry of the Confirmation Order. If the Debtor revokes or withdraws the Plan, or if Confirmation does not occur, then, with respect to all parties in interest, the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Entity or to prejudice in any manner the rights of the Debtor or such Entity in any further proceedings involving the Debtor.

(b)  The Creditors' Committee and the Legal Representative. The Creditors' Committee shall continue in existence until the Effective Date, with the Debtor to pay the reasonable fees and expenses of the Creditors' Committee and the Legal Representative through that date as well, in accordance with the fee and expense procedures promulgated during the Reorganization Case. After the Effective Date, the Legal Representative shall continue in existence and the rights, duties, and responsibilities of the Legal Representative shall be as set forth in the Trust Documents. On the Effective Date, the Creditors' Committee (and any other committee that may have been appointed in this Chapter 11 Case) shall be dissolved, and the members, attorneys, accountants, and other professionals thereof shall be released and discharged of and from all further authority, duties, responsibilities, liabilities and obligations related to, or arising from, this Chapter 11 Case. On the Effective Date, the Trust Advisory Committee will assume those powers, duties, and responsibilities as provided in the Trust Agreement.

(c)  Modification of Payment Terms. The Debtor reserves the right to modify the treatment of any Allowed Non-Asbestos Claim, as provided in § 1123(a)(4) of the Bankruptcy Code, at any time after the Effective Date with the express consent of the holder of such Allowed Non-Asbestos Claim.

(d)  Entry of Closing Order by the Bankruptcy Court. The performance of all obligations which shall be due and owing on the Effective Date pursuant to the terms of the Plan shall constitute substantial consummation of the Plan within the meaning of § 1101(2) of the Bankruptcy Code. Notwithstanding any closing of the chapter 11 case, the Clerk of the Court shall accept for filing the Asbestos Trust's Annual Report without the requirement that any party in interest file a request to reopen the case.  Further, the Asbestos Trust, the Legal Representative, the Trustee, or Reorganized State Insulation, may move on notice limited to each of them and the U.S. Trustee, to reopen the chapter 11 case for the purpose of seeking relief pursuant to the retained jurisdiction of the Bankruptcy Court provided herein, under the Confirmation Order or under applicable law.

(e)  Entire Agreement. The Plan Documents, Trust Documents, and any court-approved settlement agreement with any Settling Asbestos Insurance Companies set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions and documents.

(f)  Governing Law. Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and the Bankruptcy Rules) is applicable or where the Plan, Trust Agreement, or TDP provide otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the state of New Jersey, without giving effect to the principles of conflicts of law thereof.

(g)     <u>Consent to Jurisdiction</u>. Upon default under the Plan, all parties in interest consent to the jurisdiction of the Bankruptcy Court and agree that it shall be the preferred forum for all proceedings relating to such default.

(h)     <u>Setoffs</u>. Subject to the limitations provided in § 553 of the Bankruptcy Code, the Debtor or the Asbestos Trust, as applicable, may, but shall not be required to, setoff against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever the Debtor may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor of any such claim that the Debtor may have against such holder.

(i)     <u>Successors and Assigns</u>. The rights, duties, and obligations of any Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Entity.

(j)     <u>Non-Debtor Waiver of Rights</u>. Non-Debtor parties shall have the right to voluntarily waive any rights, benefits or protections that are afforded to them under the provisions of the Plan or any order issued in furtherance of the Plan, and such waiver shall supersede such rights, benefits, or protections. Any such waiver shall only be effective if such party expressly and specifically waives in writing one or more of such rights, benefits, or protections.

(k)     <u>No Liability for Tax Claims</u>. Unless a taxing authority has asserted a Claim against the Debtor before the bar date established therefor, no Claim of such authority shall be Allowed against the Debtor or Reorganized State Insulation for taxes, penalties, interest, additions to tax, or other charges arising out of the failure, if any, of the Debtor or any other Entity to have paid tax or to have filed any tax return (including, but not limited to, any income tax return or franchise tax return) in or for any prior year or arising out of an audit of any return for a period before the Petition Date.

(l)     <u>Interpretation of Certain Terms</u>. When used, the term "Claim" shall be broadly construed to include all manner and type of claim, whenever and wherever such claim may arise, and shall include, but not be limited to, Asbestos Claims. Likewise, when used in the Plan, the term "Asbestos Claim" shall be broadly construed and shall include, but not be limited to, claims that may or may not presently constitute "claims" within the meaning of § 101(5) of the Bankruptcy Code and demands that may or may not constitute "demands" within the meaning of § 524(g)(5) of the Bankruptcy Code and Demands as defined in the Glossary attached hereto as Exhibit B.

(m)     <u>Severability</u>. Except as provided therein, should any provision in the Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan.

5.10   <u>Modification of the Plan</u>.

The Debtor may propose amendments to or modifications of the Plan under § 1127 of the Bankruptcy Code at any time prior to the Confirmation Date. After Confirmation,

the Debtor may remedy any defects or omissions or reconcile any inconsistencies in the Plan or the Confirmation Order or any other order entered for the purpose of implementing the Plan in such manner as may be necessary to carry out the purposes and intent of the Plan so long as the interests of the Claimants are not adversely affected.  In the event of a conflict between the terms or provisions of the Plan and the Trust Documents, the terms of the Plan shall control the Trust Documents.

## ARTICLE 6
## ASBESTOS TRUST AND TRUST DISTRIBUTION PROCEDURES

THE FOLLOWING IS A SUMMARY OF CERTAIN SIGNIFICANT FEATURES OF THE ASBESTOS TRUST AND THE TRUST DISTRIBUTION PROCEDURES ("TDP").

6.1     Establishment and Purpose of the Trust.

On the Effective Date, the Asbestos Trust shall be established in accordance with the Trust Agreement (see Exhibit 2 attached to the Plan) and funded with Asbestos Trust Assets. The Asbestos Trust shall be a "qualified settlement fund" within the meaning of § 468B of the IRC and the regulations issued pursuant thereto. The purpose of the Asbestos Trust is to assume all liabilities arising from or relating to all present and future Asbestos Claims and certain other liabilities as provided in the Trust Agreement, and to use the Asbestos Trust Assets to pay holders of Asbestos Claims in accordance with the Trust Agreement and the TDP (see Plan Exhibit 2) so that all holders of present and future Asbestos Claims are treated in a substantially similar manner and to otherwise comply in all respects with the requirements of a trust set forth in § 524(g)(2)(B)(i) of the Bankruptcy Code. The TDP shall be established and implemented by the Asbestos Trust as provided in the Trust Agreement.

6.2     Asbestos Trust Assets.

The Asbestos Trust shall be funded with the Asbestos Trust Assets. The Asbestos Trust Assets include:

(a)     The Trust Promissory Note payable to the Asbestos Trust by Reorganized State Insulation, as Obligor, and all rights of the payee thereunder (as more fully described in Section 6.3);

(b)     Cash in the amount of $350,0000;

(c)     All net cash proceeds (whether receivable on the Effective Date or otherwise), other proceeds and rights, arising from or related to the State Insulation's rights to pursue and receive the benefits and proceeds of product liability coverage with respect to asbestos product liability claims against the Asbestos Insurance Policies; and

(d)     The Collateral Pledge of an account or accounts containing liquid assets of not less than 100% of the outstanding amount of the Trust Promissory Note by George Lionikis, Sr. (and/or such other Released State Insulation Parties as shall be designated not less than ten (10) days prior to the Confirmation Hearing.

The Plan provides in Section 5.2 that Reorganized State Insulation will transfer to the Asbestos Trust any proceeds from any Asbestos Insurance Policies, Asbestos Insurance Actions, and other rights and benefits related thereto.

6.3     Trust Promissory Note.

On the Effective Date, State Insulation will issue the Trust Promissory Note in a form substantially similar to the promissory note attached to the Plan as Exhibit 3. The substantive terms of the Trust Promissory Note obligations are outlined below:

(a)     Principal: $1,300,000

(b)     Term and Interest: 7-year note, 2% interest.

(c)     Amortization: Principal and unpaid accrued interest, paid quarterly, commencing on the last day of the third full month following the Effective Date.

(d)     Pre-payment of Note: State Insulation may pre-pay the note, in whole or in part, at any time without penalty.

(e)     Issuance of Shares Upon Default. Pursuant to §524(g) of the Bankruptcy Code and to secure Reorganized State Insulation's performance under the Trust Promissory Note, the Asbestos Trust will have the right to cause Reorganized State Insulation to issue to the Asbestos Trust after the occurrence of a payment Event of Default under the terms of the Trust Promissory Note, a sufficient number of shares of voting stock of Reorganized State Insulation (or capital stock or other property into which the voting stock was converted) so that the Asbestos Trust will hold 50.1% of the then issued and outstanding voting stock of Reorganized State Insulation.

6.4     Receipt of Asbestos Trust Assets; Certain Obligations.

On the Effective Date, all Asbestos Trust Assets shall be transferred to, vested in, and assumed by the Asbestos Trust free and clear of liens, claims and encumbrances; provided, however, that to the extent that certain Asbestos Trust Assets, because of their nature or because they will accrue subsequent to the Effective Date, cannot be transferred to, vested in, and assumed by the Asbestos Trust on the Effective Date, such Asbestos Trust Assets shall be transferred to, vested in, and assumed by the Asbestos Trust as soon as practicable after the Effective Date.  If a settlement agreement with any Settling Asbestos Insurance Company is approved by a Final Order of the Bankruptcy Court with the consent of the Creditors' Committee and Legal Representative on or prior to the Effective Date, the settlement proceeds thereunder will be transferred to, vested in, and assumed by the Asbestos Trust on the Effective Date.  If a settlement agreement with any Asbestos Insurance Company has not been so approved by the Effective Date, all rights and proceeds thereunder will be transferred to, vested in, and assumed by the Asbestos Trust on the Effective Date.  Upon the transfer of the Asbestos Trust Assets on the Effective Date, the Debtor and Reorganized Debtor shall have no further monetary obligations under any Asbestos Insurance Policy or any settlement agreement with any Settling Asbestos Insurance Company, including but not limited to, any required deductible, self-insured retention, or any other amounts that may come due or owing. Such obligations, if any, will be

transferred to and assumed by the Asbestos Trust, along with the right to receive proceeds from any Asbestos Insurance Policy or settlement agreement with a Settling Asbestos Insurance Company.

Reorganized State Insulation shall, upon request from the Trustee from time to time, transfer to the Asbestos Trust any rights which the Trustee may reasonably determine may be rights held by State Insulation in any additional Asbestos Insurance Policies, Asbestos Insurance Actions, and other rights and benefits related thereto, and such rights will be vested in and assumed by the Asbestos Trust.

6.5     Discharge of Liabilities to Holders of Asbestos Claims.

The transfer to, vesting in, and assumption by the Asbestos Trust of the Asbestos Trust Assets as contemplated by the Plan, among other things, shall (1) discharge the Debtor and Reorganized State Insulation from and in respect of all Asbestos Claims and (2) discharge, release, and extinguish all obligations and liabilities of the Released Parties, for and in respect of all Asbestos Claims. The Asbestos Trust shall assume responsibility and liability for all Asbestos Claims.

6.6     Asbestos Trust Expenses.

The Asbestos Trust shall pay all Asbestos Trust Expenses pursuant to the Trust Agreement from its assets.  Neither the Debtor nor Reorganized State Insulation shall have any obligation to pay any Asbestos Trust Expenses.

6.7     Selection of the Initial Trustee.

The individual(s) who will serve as the initial Trustee shall be identified by the Debtor, with the consent of the Creditors' Committee and the Legal Representative, not later than the tenth (10th) day prior to the Confirmation Hearing. All subsequent Trustees shall be appointed in accordance with the terms of the Trust Agreement. For purposes of performing his duties and fulfilling his obligations under the Trust Agreement and the Plan, the Trustee shall be deemed to be a "party in interest" within the meaning of § 1109(b) of the Bankruptcy Code.

6.8     The Legal Representative for Future Asbestos Claimants.

The Legal Representative shall serve as the Legal Representative pursuant to the terms of the Trust Agreement, on and after the Effective Date, and shall have the functions and rights provided in the Trust Documents.  Neither the Debtor nor Reorganized State Insulation shall have any liability for the fees and expenses incurred by the Legal Representative following the Effective Date.  Such fees and expenses shall be payable by the Asbestos Trust in accordance with the Trust Documents.

6.9     Indemnification of State Insulation.

As and to the extent provided in the Trust Agreement, the Asbestos Trust shall indemnify and hold harmless the Debtor, Reorganized State Insulation, the Released State Insulation Parties, the Trustee, any officers and employees of the Asbestos Trust, the Futures Representatives, each member of the TAC, and with regard to each of the foregoing, their

respective past, present and future representatives for Asbestos Claims prosecuted against Reorganized State Insulation in violation of the Supplemental Injunction.

6.10    Effect of Statutes of Limitation.

The TDP provides that all unliquidated Asbestos Claims must meet either (i) for claims first filed in the tort system against State Insulation prior to the Petition Date, the applicable statute of limitation and repose that was in effect at the time of the filing of the claim in the tort system, or (ii) for claims not so filed prior to the Petition Date, the applicable statute of limitation that was in effect at the time of the filing with the Asbestos Trust. However, the running of the relevant statute of limitation will be tolled as of the earliest of (A) the actual filing of the claim against State Insulation prior to the Petition Date, whether in the tort system or by submission of the claim to State Insulation pursuant to an administrative settlement agreement; (B) the tolling of the claim against State Insulation prior to the Petition Date by an agreement or otherwise, provided such tolling is still in effect on the Petition Date; or (C) the Petition Date.

The TDP also provides that if an Asbestos Claim meets any of the tolling provisions described above and the claim was not barred by the applicable statute of limitation at the time of the tolling event, it will be treated as timely filed if it is actually filed with the Asbestos Trust within two (2) years after the date six (6) months after the date that the Asbestos Trust first makes available the proof of claim forms and other claims materials required to file a claim with the Asbestos Trust (the "Initial Claims Filing Date"). In addition, any claims that were first diagnosed after the Petition Date, irrespective of the application of any relevant federal, state, or foreign statute of limitation or repose, may be filed with the Asbestos Trust within three (3) years after the date of diagnosis or within two (2) years after the Initial Claims Filing Date, whichever occurs later.

## ARTICLE 7
### CONFIRMATION OF THE PLAN

7.1    Acceptance or Rejection of the Plan.

(a)    Persons Entitled to Vote on the Plan. Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims that are impaired under the terms and provisions of the Plan are entitled to vote to accept or reject the Plan. Generally speaking, under § 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" under a plan of reorganization unless, with respect to each claim or interest in such class, the plan in question: (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default (A) cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of the kind specified in section 365(b)(2) thereof, (B) reinstates the maturity of such claim or interest as such maturity existed before such default, (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, and (D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

-43-

Under the Plan, Classes 1, 2, 3, 5, and 6 are unimpaired; therefore, the holders of Claims in such Classes are conclusively presumed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code. State Insulation will not solicit acceptances of the Plan from these Classes.

Class 4 is impaired; therefore, the holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

(b)    Class Acceptance Requirement. Chapter 11 of the Bankruptcy Code does not require that each holder of an impaired Claim vote in favor of the Plan for it to be confirmed by the Bankruptcy Court.

(c)    Acceptance Pursuant to § 524(g) of the Bankruptcy Code. In accordance with § 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code, Class 4 (Asbestos Claims) shall have accepted the Plan, and a supplemental injunction may be issued if, among other things, at least seventy-five percent (75%) of those actually voting in Class 4 vote to accept the Plan.

(1)    Each holder of a Class 4 shall be entitled to one vote. The Ballot for Class 4 claims will require the holder to designate one of several specified disease categories (identified below), each of which will be assigned a dollar amount for purposes of voting only. The designation of the disease category by the holder of an Asbestos Claim or his or her attorney will be for voting purposes only and will not be binding upon the holder, the Debtors, or the Asbestos Trust for any purpose other than for voting on the Plan. Only one disease level may be selected for each holder of an Asbestos Claim. In the event more than one disease level is selected, the selected disease level with the highest value will be counted for voting purposes. In the event no disease level is selected by or on behalf of a holder of an Asbestos Claim, the Ballot shall be counted as a vote under Disease Level I for voting purposes only. The amount of an Asbestos Claim, for voting purposes only, is as follows:

[To be Provided]

7.2    Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Court, after notice, to hold a hearing on confirmation of a plan. As promptly as practicable, State Insulation will request the Bankruptcy Court to schedule the Confirmation Hearing. Notice of the Confirmation Hearing will be provided to all creditors and equity holders or their representatives. The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objecting party, the nature and amount of Claims held or asserted by the objecting party against State Insulation's Estate or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon (1) counsel for State Insulation, Jeffrey D. Prol and Thomas A. Pitta, Lowenstein Sandler PC, 65 Livingston Avenue,

Roseland, NJ 07068, (2) the Legal Representative, Edward Bond, Bederson & Company, 405 Northfield Avenue, West Orange, NJ 07052 and (3) counsel for the Creditors' Committee, Nancy Isaacson, Greenbaum, Rowe, Smith & Davis, LLP, 75 Livingston Avenue, Roseland, NJ 07068, so as to be received no later than the date and time for service of the objections, as designated in the notice of the Confirmation Hearing.

      7.3    Requirements for Confirmation.

      (a)    Consensual Confirmation Under § 1129(a) of the Bankruptcy Code. At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of § 1129(a) of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court will enter the Confirmation Order. Such requirements include, among others:

      (1)    That the Plan complies with applicable provisions of the Bankruptcy Code.

      (2)    That State Insulation has complied with the applicable provisions of the Bankruptcy Code.

      (3)    That the Plan has been proposed in good faith and not by any means forbidden by law.

      (4)    That any payment made or promised by State Insulation to any Person for services, costs, or expenses in or in connection with the Reorganization Case or the Plan has been approved by or is subject to approval by the Bankruptcy Court as reasonable.

      (5)    That State Insulation has disclosed the identity and affiliations of any individual proposed to serve as a director or an officer of Reorganized State Insulation after Confirmation of the Plan and that the appointment to, or continuance in, such office by such individual is consistent with the interests of holders of Claims and Equity Interests and with public policy.

      (6)    That the Plan is in the best interests of the holders of Claims and Equity Interests; that is, each holder of an Allowed Claim or Allowed Equity Interest either has accepted the Plan or will receive or retain on account of its Claim or Equity Interest property with a value, as of the Effective Date, that is not less than the amount that the holder would receive or retain if State Insulation were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

      (7)    That, except to the extent the Plan meets the "nonconsensual confirmation" standards discussed below, each Class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan.

      (8)    That, except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and Priority Claims will be paid in full on the Effective Date or in the ordinary course of business (to the extent incurred in the ordinary course of business post-petition) and that Priority Tax Claims will be paid in full on the Distribution Date.

(9)    That at least one impaired and non-insider Class of Claims has accepted the Plan.

(10)    That the Plan is feasible; that is, Confirmation is not likely to be followed by the need for liquidation or further reorganization of Reorganized State Insulation.

(11)    That all fees payable under § 1930 of Title 28 have been paid on or prior to the Effective Date.

(12)    That the Plan provides for the continuation after the Effective Date of payment of all retiree benefits, as that term is defined in § 1114 of the Bankruptcy Code, without modification by the Plan, thereby complying with § 1114 of the Bankruptcy Code.

State Insulation believes that the Plan satisfies all applicable requirements of § 1129(a) of the Bankruptcy Code.

(b)    Best Interests Test.

Under the best interests test, the Plan is confirmable if, with respect to each impaired Class of Claims, each holder of an Allowed Claim in such Class either (a) has accepted the Plan or (b) will receive or retain under the Plan, on account of its Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if State Insulation were to be liquidated under Chapter 7 of the Bankruptcy Code.

To determine what the holders in each Class of Claims or Interests would receive if State Insulation were to be liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of State Insulation' assets and properties in the context of a Chapter 7 liquidation case. The cash amount that would be available for satisfaction of the Allowed Claims and Allowed Interests of State Insulation would consist of the proceeds resulting from the disposition of the assets of State Insulation, augmented by the cash held by State Insulation at the time of the commencement of the Chapter 7 case. Such cash amount would be reduced by the costs and expenses of the liquidation and by any additional Administrative Expense Claims and Priority Claims that would result from the termination of State Insulation's business and the use of a Chapter 7 proceeding for the purposes of liquidation. See Exhibit D (Liquidation Analysis) attached hereto.

State Insulation firmly believes that the distributions that would be made in a Chapter 7 case would be substantially smaller than the distributions contemplated by the Plan because, among other reasons, in a Chapter 7 case, no value would be provided to unsecured creditors on account of the going concern of State Insulation and all of the assets of State Insulation would be subject to the secured claims of the Prepetition lender.

State Insulation therefore believes that the Plan is in the best interests of all holders of Claims and Interests.

(c)    Feasibility of the Plan.

In order for the Plan to be confirmed, the Bankruptcy Court also must determine that the Plan is feasible – that is, that the need for further reorganization or a subsequent

liquidation of State Insulation is not likely to result following Confirmation of the Plan. In determining whether a plan of reorganization is feasible, a court will consider (A) the adequacy of the proposed capital structure of the reorganized entity, (B) its earning power, (C) the overall economic conditions in which it will operate, (D) the capability of its management, (E) the continuity of its management, and (F) any other factors the court deems relevant to the successful operation of the reorganized entity to perform the provisions of the Plan.

Reorganized State Insulation will be discharged from Asbestos Claims and will otherwise be, in general, free of prepetition debt, other than obligations to the Prepetition Lender or other holders of executory contracts that may be assumed by the Debtor, and its ongoing business expenses and reorganization costs. It will retain the core business of State Insulation, and State Insulation anticipates that the cash flow generated by these assets will be sufficient to pay its ongoing business expenses, including its obligations under the Trust Promissory Note. See Exhibit C (Reorganized State Insulation's Financial Projections) attached hereto.

State Insulation, therefore, believes that the Plan is feasible.

(d)     Acceptance by an Impaired Class.

Because the Plan impairs some Classes of Claims, Section 1129(a)(10) of the Bankruptcy Code requires that for the Plan to be confirmed, at least one impaired Class must accept the Plan by the requisite vote. As more fully described herein (see Section 7.1(a), (b) and (c) hereof), an impaired Class of Claims will have accepted the Plan if and only if at least two-thirds in amount and more than one-half in number of the Allowed Claims in such Class that vote have voted in favor of acceptance of the Plan.

(e)     Nonconsensual Confirmation Under § 1129(b) of the Bankruptcy Code.

Although § 1129(a)(8) of the Bankruptcy Code requires that a plan be accepted by each class that is impaired by such plan, Section 1129(b) of the Bankruptcy Code provides that the Bankruptcy Court may still confirm the Plan at the request of State Insulation if all requirements of § 1129(a) (except § 1129(a)(8)) are met and if, with respect to each Class of Claims that is impaired under the Plan and has not voted to accept the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A plan confirmed on the basis of this provision is commonly referred to as a "cramdown" plan. In the event an impaired Class of Claims does not accept the Plan, State Insulation may seek cramdown confirmation of the Plan with respect to any such non-accepting Class.

(1)     Unfair Discrimination.

A plan of reorganization does not discriminate unfairly if no class receives more than it is legally entitled to receive for its claims or equity interests. State Insulation believes that the Plan meets this requirement.

(2)     Fair and Equitable Test. "Fair and equitable" has different meanings for Secured Claims, Unsecured Claims and Equity Interests.

With respect to an Unsecured Claim such as Class 4 and Class 5 Claims, "fair and equitable" means either (A) the Plan provides that each holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date, equal to the Allowed Amount of such Claim; or (B) the holder of any Claim or Interest that is junior to the Claims of such Class will not receive or retain any property under the Plan on account of such junior Claim or Interest.

With respect to a Secured Claim, "fair and equitable" means that the Plan provides either (A) that the holder of a Secured Claim in an impaired Class retains the Liens securing such Claim, whether the property subject to such Liens is retained by State Insulation or transferred to another Entity, to the extent of the amount of such Allowed Claim; and that the holder of such Claim receives on account of such Claim deferred cash payments totaling at least the amount of such Allowed Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in the Estate's interest in such property, (B) for the sale, subject to § 363(k) of the Bankruptcy Code, of any property that is subject to the Liens securing such Claim, free and clear of such Liens, with such Liens to attach to the proceeds of such sale, and the treatment of such Liens on proceeds under subsection (A) or (C) hereof, or (C) the realization by such holder of the "indubitable equivalent" of such Claim.

With respect to an Equity Interest, "fair and equitable" means either (A) each holder of an Interest in an impaired Class receives or retains property of a value, as of the Effective Date, equal to the greatest of the Allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such Interest; or (B) the holder of any Interest that is junior to the Interests of such Class will not receive or retain any property under the Plan on account of such junior Interest.

(f)     Injunctions Under § 524(g) of the Bankruptcy Code. Section 524(g) of the Bankruptcy Code authorizes the Bankruptcy Court to enjoin Entities from taking action to collect, recover, or receive payment or recovery with respect to any Claim or Demand that is to be paid in whole or in part by a trust created by a plan of reorganization that satisfies the requirements of the Code. The injunction may also bar any action based on such Claims or Demands against State Insulation that are directed at third parties.

To obtain the injunction, a trust must be established that (1) assumes State Insulation's Asbestos Claims; (2) is funded in whole or in part by State Insulation or with an obligation by State Insulation to make future payments; (3) owns or is entitled, if specific contingencies occur, to a majority of the voting shares of State Insulation, its parent corporation or its subsidiaries, if any, that are also Debtors; and (4) uses its assets or income to satisfy claims and demands.

As a requirement before issuing an injunction under § 524(g) of the Bankruptcy Code, the Bankruptcy Court must determine that (1) State Insulation is likely to be subject to substantial demands for payment arising out of the same or similar conduct or events that give rise to the Asbestos Claims that are addressed by the injunction; (2) the actual amounts, numbers and timing of such demands cannot be determined; (3) pursuit of such demands outside the procedures prescribed by the plan is likely to threaten the plan's purpose to deal equitably with claims and demands; and (4) the trust will operate through mechanisms such as structural, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of

estimates of the numbers and values of claims and demands, or other comparable mechanisms that provide reasonable assurance that the trust will value, and be in a financial position to pay, claims and demands that involve similar claims in substantially the same manner.

The Bankruptcy Court must also insure that the terms of any proposed § 524(g) injunction are set out in the Plan and Disclosure Statement and that seventy-five percent (75%) of the Asbestos Claimants who actually vote on the plan vote to approve it. Moreover, the injunction will be valid and enforceable as to future asbestos claimants only if a legal representative is appointed to protect their rights in the proceedings and if a bankruptcy court determines that applying the injunction to future asbestos claimants in favor of the beneficiaries of the injunction is fair and equitable with respect to the Persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to the Asbestos Trust on behalf of State Insulation or a beneficiary of the Supplemental Injunction.

The order confirming the plan must be issued or affirmed by the district court that has jurisdiction over the case. After the expiration of the time for appeal of the order, the injunction becomes valid and enforceable.

State Insulation believes that it will be able to satisfy all the requirements of §524(g), so long as the requisite numbers of Asbestos Claimants vote in favor of the Plan.

Under the jurisdictional scheme applicable to bankruptcy courts, jurisdiction over bankruptcy cases and proceedings arising under the Bankruptcy Code or arising in or related to bankruptcy cases is vested in the district courts. However, the district courts may refer such issues to the bankruptcy judges of the district. In most districts, the district court has entered a standing order referring all such matters to the bankruptcy judges.

7.4     Effect of Confirmation.

Upon the Bankruptcy Court's entry and the District Court's affirmation of the Confirmation Order, the Plan will be binding upon State Insulation, Reorganized State Insulation, all holders of Claims and Interests and all other parties in interest, regardless of whether they have accepted the Plan.

**ARTICLE 8**
**RISKS OF THE PLAN**

8.1     General.

The success of Reorganized State Insulation is dependent on several factors. Among these factors is the continuing contributions of key employees – both management and non-management. The following is intended as a summary of certain risks associated with the Plan, but is not exhaustive and must be supplemented by the analysis and evaluation of the Plan and this Disclosure Statement as a whole by each holder of a Claim or an Equity Interest with such holder's own advisors.

8.2     Confirmation Risks.

For the Plan to be confirmed, each impaired Class of Claims is given the opportunity to vote to accept or reject the Plan. With regard to the impaired Classes which vote on the Plan, the Plan will be deemed accepted by a Class of impaired Claims if the Plan is accepted by holders of Claims of such Class actually voting on the Plan who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the total Allowed Claims of such Class. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes. The Plan must also comply with the requirements of § 524(g) of the Bankruptcy Code. See Section 7.1 above.

Any objection to the Plan by a member of a Class of Claims or Interests could either prevent Confirmation of the Plan or delay such Confirmation for a significant period of time. Moreover, although State Insulation believes that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Further, certain provisions of the Plan are subject to modification if the Bankruptcy Court so directs. As to each such provision, there is no assurance that the Bankruptcy Court will not order such modification. If the Court does so, the enforceability and operative effect of any and all other provisions of the Plan will not be limited or affected unless the Legal Representative or the Creditors' Committee object to the Bankruptcy Court's determination in writing prior to the Effective Date. In that event, the remaining provisions of the Plan will not be enforceable or given operative effect, and Confirmation will not be effective without further order of the Bankruptcy Court. See Section 15.7 of the Plan.

8.3     General Economic Conditions – Financial Performance.

The purchasing requirements of the Debtor's customers are heavily influenced by general economic conditions as well as fluctuations in the building market. Accordingly, the Debtor faces market risks associated with the cyclical nature of the businesses of the end-users of its products.

The market risk noted above may impact State Insulation's ability to meet its obligations under the Trust Promissory Note, which may affect Asbestos Trust cash flows. However, because all other claimants will be paid on or shortly after the Effective Date or in accordance with ordinary terms, State Insulation's future earnings should not affect distributions to Classes whose Claims are not to be paid from the Asbestos Trust.

8.4     Variance from Reorganized State Insulation's Financial Projections.

The financial projections contained in Reorganized State Insulation's Financial Projections (see Exhibit C attached hereto) are estimates by State Insulation's management based on what are currently believed to be reasonable assumptions regarding the future earnings of Reorganized State Insulation. Unanticipated events and circumstances occurring subsequent to the preparation of Reorganized State Insulation's Financial Projections may affect the actual financial results of Reorganized State Insulation. Although State Insulation's management believes that Reorganized State Insulation's Financial Projections are reasonable and attainable, some or all of the estimates will vary and variations between the actual financial results and those projected may be material and adverse.

The Financial Projections are based upon numerous assumptions regarding (a) the tax consequences of the Plan (see Article 10 herein); (b) the anticipated future performance of Reorganized State Insulation; (c) the Confirmation and consummation of the Plan in accordance with its terms; (d) general business and economic conditions; and (e) certain other matters, many of which are beyond the control of State Insulation. There can be no assurance that such assumptions will prove to be valid and the effect of any variance from the projections may be material and adverse.

8.5     Insurance Coverage for Asbestos Claims.

A discussion of the insurance coverage available for Asbestos Claims is provided in Section 3.3(b) hereof.  One or more carriers of the Asbestos Insurance Policies may become insolvent in the future may impact the value of State Insulation' Asbestos Insurance Policies and may impact State Insulation' insurance coverage.  Atlantic Mutual Insurance Company, the Debtor's primary insurer with respect to Asbestos Claims, is currently the subject of a liquidation proceeding in New York State.  It is unclear whether, and to what extent, Atlantic Mutual Insurance Company will be able to satisfy its obligations with respect to Asbestos Claims against the Debtor.

8.6     Distributions to Asbestos Claimants.

The amount of money that each Asbestos Claimant holding an Allowed Asbestos Claim will receive is directly related to the funds available in the Asbestos Trust for distribution for Asbestos Claims and the number of Asbestos Claims, including Future Asbestos Claims.

8.7     Federal Income Tax Consequences of the Plan.

The law with respect to certain federal income tax consequences of the Plan is uncertain. Pursuant to Section 10.2 of the Plan, the Effective Date shall not occur, unless, among other things, State Insulation either (i) receives a private letter ruling from the Internal Revenue Service ("IRS") confirming, among other things, that the Asbestos Trust is a "qualified settlement fund" pursuant to § 468B of the IRC and the regulations promulgated thereunder or, in the alternative, (ii) obtains decisions, opinions or assurances that the Asbestos Trust is a "qualified settlement fund" under § 468B of the IRC, which are deemed satisfactory by State Insulation, Reorganized State Insulation, the Creditors' Committee and the Legal Representative. If the desired private letter ruling or satisfactory decisions, opinions and assurances cannot be obtained, the Effective Date of the Plan will not occur or the Asbestos Trust may be modified according to its terms to come within IRC guidelines under § 468B of the IRC.

8.8     Risk of Post-Confirmation Default.

Although no guarantees can be given, State Insulation believes that sufficient operating cash flow will be generated to meet Reorganized State Insulation's operating requirements and to satisfy its obligations, including obligations under the Trust Promissory Note. Projected Reorganized State Insulation statement of operations is described in the Financial Projections for Reorganized State Insulation attached hereto as Exhibit C. At the Confirmation Hearing, the Bankruptcy Court will be required to make a judicial determination that the Plan is feasible.

# ARTICLE 9
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (a) liquidation of State Insulation under Chapter 7 of the Bankruptcy Code; and (b) an alternative plan of reorganization.

9.1     Liquidation Under Chapter 7.

If no plan can be confirmed, State Insulation's Reorganization Case may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of State Insulation for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a Chapter 7 liquidation after the failure of a Chapter 11 filing would have on the recovery of holders of Claims and Equity Interests and State Insulation' liquidation analysis are described in this Section 9.1 below. State Insulation believes that liquidation under Chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because, among other things, in a Chapter 7 case, no value would be provided to unsecured creditors on account of the going concern of State Insulation and all of the assets of State Insulation would be subject to the secured claims of the Prepetition Lender.

Attached to this Disclosure Statement as Exhibit D is a Liquidation Analysis for State Insulation, which assumes that a bankruptcy case under Chapter 7 is commenced upon a failure of a Chapter 11 filing, and that State Insulation's assets are liquidated by a court-appointed trustee in an orderly liquidation. The Liquidation Analysis is based upon a number of estimates and assumptions which, while considered reasonable, are inherently beyond the control of State Insulation or any Chapter 7 trustee. Accordingly, there can be no assurances that the values reflected in the Liquidation Analysis would be realized if State Insulation were to undergo such Chapter 7 liquidation. Instead, actual results could vary materially from those shown there. In addition, any liquidation would necessarily take place in the future under circumstances that presently cannot be predicted. Accordingly, if State Insulation's Estate was liquidated, the actual liquidation proceeds could be materially lower or higher than the amounts set forth in Exhibit D, and no representation or warranty can be made with respect to the actual proceeds that could be received in a Chapter 7 liquidation.

9.2     Alternative Plan of Reorganization.

If the Plan is not confirmed, State Insulation (or if State Insulation's exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan of reorganization. However, the Plan is the product of extensive negotiations among State Insulation, the Ad Hoc Committee, Edward Bond, the Creditors' Committee and the Legal Representative, and is a delicate balance of the competing and conflicting interests held by those parties. Any attempt to propose an alternative plan containing different terms for any of these parties would threaten to disrupt the balance established by the global settlement.

STATE INSULATION BELIEVES THAT THE CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE TO THE LIQUIDATION

ALTERNATIVE BECAUSE IT SHOULD PROVIDE GREATER RECOVERIES THAN THOSE AVAILABLE IN LIQUIDATION. **ADDITIONALLY, THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS AND THE LEGAL REPRESENTATIVE FOR FUTURE ASBESTOS CLAIMANTS SUPPORT THE PLAN AND RECOMMEND THAT ASBESTOS CLAIMANTS VOTE IN FAVOR OF IT.**

## ARTICLE 10
## CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain material federal income tax consequences of the implementation of the Plan to State Insulation and to certain holders of Allowed Claims. This summary does not address the federal income tax consequences to (i) holders of Claims who are deemed to have rejected the Plan in accordance with the provisions of § 1126(g) of the Bankruptcy Code, (ii) holders whose Claims are entitled to payment in full in Cash or are otherwise unimpaired under the Plan (e.g., allowed Administrative Expense Claims and Allowed Priority Tax Claims), or (iii) holders whose Claims are extinguished without distribution in exchange therefor.

This summary is based on the Internal Revenue Code of 1986, as amended (the IRC), existing and proposed Treasury Regulations promulgated thereunder ("Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. Except as discussed in Section 10.3 below, State Insulation has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary does not address state, local or foreign income or other tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, tax-exempt organizations, certain expatriates, or former long term residents of the United States, or pass-through entities or investors in pass-through entities).

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

10.1    <u>Tax Consequences to State Insulation</u>.

(a)     Discharge of Indebtedness. The IRC provides that a debtor in a bankruptcy case must reduce certain of its tax attributes (such as net operating loss ("NOL") carryforwards, current year NOLs, tax credits, and tax basis in assets) by the amount of any cancellation of debt ("COD") that arises by reason of the discharge of the debtor's indebtedness. COD is the amount by which the adjusted issue price of indebtedness discharged exceeds the amount of cash, the issue price of any debt instrument and the fair market value of any other property given in exchange therefore, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction).

If the amount of such a debtor's COD is sufficiently large, it can eliminate these favorable tax attributes; to the extent the amount of COD exceeds the amount of such tax attributes, the excess COD has no adverse federal income tax consequence (i.e., the remaining COD is simply forgiven). Any reduction in tax attributes under these rules does not occur until the end of the taxable year after such attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD occurs.

State Insulation may recognize certain COD as a result of the discharge of Claims pursuant to the Plan; and certain tax attributes of State Insulation may be reduced or eliminated. No COD will be recognized and no reduction of tax attributes will occur to the extent State Insulation's payment of a cancelled debt would have given rise to a tax deduction.

Under the Plan, each holder of Allowed Administrative Expense Claims, Allowed Priority Tax Claims and other Allowed Claims in Classes 1, 2, 3 and 5 will be paid the full amount of their Allowed Claims. Since these claims will be paid in full, satisfaction of such Claims should not give rise to COD to State Insulation (except to the extent interest previously accrued and deducted by State Insulation is not required to be paid).

(b)     Property Transfers to the Asbestos Trust. The Debtor may seek either (i) a private letter ruling from the Internal Revenue Service to the effect that the Asbestos Trust will be a "qualified settlement fund" within the meaning of § 468B of the IRC and the regulations promulgated thereunder or (ii) other decisions, opinions or assurances regarding certain tax consequences of the Plan (see Section 5.4(b)(5) herein). State Insulation believes it could take several months to obtain a response to any letter ruling request, and it may not be obtained prior to the Confirmation Date.

The regulations promulgated under § 468B of the IRC provide that a fund, account or trust will be a qualified settlement fund if three conditions are satisfied. First, the fund, account or trust must be established pursuant to an order of or be approved by a government authority, including a court, and must be subject to the continuing jurisdiction of that government authority. A court order giving preliminary approval to a fund, account or trust will satisfy this requirement even though the order is subject to review or revision. Second, the fund, account or trust must be established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event or related series of events that has occurred and that has given rise to at least one claim asserting liability arising, among other things, out of a tort. Third, the fund, account or trust must be a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and persons related to the

-54-

transferor. The Asbestos Trust will be established with the express purpose of satisfying the requirements of a qualified settlement fund. While discretion to issue a ruling on this point rests entirely with the IRS, State Insulation believes it will be able to obtain either a ruling that the Asbestos Trust is a qualified settlement fund or, in the alternative, the other decisions, opinions or assurances referred to above.

If, as expected, the Asbestos Trust is a qualified settlement fund, Reorganized State Insulation should generally be entitled to a deduction for its payments thereto once it has satisfied the usual requirements imposed on accrual basis taxpayers with respect to liabilities. The amount of the aggregate deduction to which State Insulation will be entitled will equal the sum of any cash and the fair market value of other property (excluding any indebtedness of State Insulation) transferred to the Asbestos Trust to satisfy Asbestos Claims. It should be noted, however, that no deduction for transfers to the Asbestos Trust will be allowed to the extent the transferred amounts represent amounts received from the settlement of insurance claims, which amounts were not included in State Insulation's gross income.

(c)     Net Operating Losses and Other Attributes. Following the Effective Date, State Insulation may have NOLs. As explained above, however, State Insulation's NOLs and other tax attributes may be reduced or eliminated as of the beginning of the taxable year following the year in which the Effective Date occurs as a result of COD income. Accordingly, there can be no assurance that Reorganized State Insulation will have NOLs following the year in which the Plan is implemented.

As a general rule, an NOL incurred by a taxpayer during a taxable year can be carried back and deducted from its taxable income generated within the two preceding taxable years and the remainder carried forward and deducted from the taxable income of the twenty (20) succeeding taxable years. NOLs attributable to certain tort liability losses ("specified liability losses"), however, may be carried back for ten years. An NOL constitutes a specified liability loss to the extent it is attributable to product liability, or to expenses incurred in the investigation or settlement of, or opposition to, claims against the taxpayer on account of product liability. State Insulation believes that any NOL resulting from the payments to the Asbestos Trust should constitute a specified liability loss and, therefore, should qualify for the ten-year carry-back period.

(d)     Limitations on Net Operating Losses and Other Tax Attributes. With respect to any NOLs of State Insulation remaining after Confirmation of the Plan and any required attribute reduction, Section 382 of the IRC contains certain rules limiting the ability of corporate taxpayers to utilize NOLs when there has been an "ownership change." If a corporation (or consolidated group) undergoes an "ownership change," the amount of its pre-change losses (including NOL carryforwards from periods before the ownership change and certain losses or deductions which are "built-in" (i.e., economically accrued but unrecognized), as of the date of the ownership change) that may be utilized to offset future taxable income generally is subject to an annual limitation (referred to as the "Annual Limitation").

Subject to the business continuation requirement discussed below, the amount of this Annual Limitation is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate,"

which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the ownership change occurs. For a corporation (or consolidated group) in bankruptcy that undergoes the ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined immediately after (rather than before) the ownership change by taking into account the surrender or cancellation of creditors' claims, also with certain adjustments. The Annual Limitation can potentially be increased by the amount of certain recognized built-in gains.

Notwithstanding the foregoing general rule, however, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, the Annual Limitation resulting from the ownership change is zero (potentially increased by certain recognized built-in gains).

As indicated above, the Annual Limitation does not only limit the amount of NOL carryforward that can be utilized after an ownership change occurs, it can also operate to limit the deductibility of built-in losses recognized subsequent to the date of the ownership change. If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the Annual Limitation. Conversely, if the loss corporation (or consolidated group) has a net unrecognized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the Annual Limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. Although the rules applicable to net unrealized built-in losses generally apply to consolidated groups on a consolidated basis, certain corporations that join the consolidated group within the preceding five (5) years may not be able to be taken into account in the group computation of net unrealized built-in loss. Such corporations would nevertheless still be taken into account in determining whether the consolidated group has a net unrealized built-in gain. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million, or (ii) 15% of the fair market value of the assets (with certain adjustment) before the ownership change.

An exception to the foregoing annual limitation rules generally apply where qualified (so-called "old and cold") creditors of a debtor receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or of a controlling corporation if also in bankruptcy) pursuant to a confirmed Chapter 11 plan. Under this exception, a debtor's pre change losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the reorganization, and during the part of the taxable year prior to and including the reorganization, in respect of all debt converted into stock in the bankruptcy proceeding. Moreover, if this exception applies, any further ownership change of the debtor within a two year period after the consummation of the Chapter 11 plan will preclude the debtor's future utilization of any pre-change losses existing at the time of the subsequent ownership change.

-56-

In light of the foregoing, State Insulation's ability to utilize certain NOLs (and carryforwards thereof) and certain other tax attributes would be potentially subject to limitation if State Insulation were to undergo an "ownership change" within the meaning of § 382 of the IRC by reason of the implementation of the Plan (or otherwise). State Insulation believes that Reorganized State Insulation should not undergo an "ownership change" as a result of the implementation of the Plan; however, Reorganized State Insulation may be deemed to undergo an "ownership change" in the future if State Insulation subsequently defaults on the Trust Promissory Note it transferred to the Asbestos Trust (by reason of its obligation to issue to the Asbestos Trust upon its request 50.1 % of the stock of Reorganized State Insulation if there shall occur such a default in accordance with the terms of such Trust Promissory Note).

(e)      Alternative Minimum Tax. A corporation may incur a federal alternative minimum tax ("AMT") liability even where NOL carryovers and other tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax. It is possible Reorganized State Insulation will be liable for the AMT.

10.2    Tax Consequences to Holders of Certain Claims.

(a)      In General. A holder of a Claim who receives Cash or other consideration in satisfaction thereof may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest. A holder of a Claim who was not previously required to include as income accrued but unpaid interest attributable to its Claim, and who surrenders its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for federal income tax purposes as interest, regardless of whether the holder of the Claim realizes an overall gain or loss as a result of surrendering its Claim. A holder of a Claim who previously included as income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether the holder of the Claim realizes an overall gain or loss as a result of surrendering its Claim. Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, State Insulation intends, consistent with the Plan, to allocate the consideration paid pursuant to the Plan with respect to a Claim, first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim. Accordingly, in cases where a holder of a Claim receives less than the principal amount of its Claim, State Insulation intends to allocate the full amount of consideration transferred to such holder to the principal amount of such obligation and to take the position that no amount of the consideration to be received by such holder is attributable to accrued interest. There is no assurance that such allocation will be respected by the IRS for federal income tax purposes.

(b)      Tax Consequences to Holders of Class 4 Asbestos Claims. To the extent payments from the Asbestos Trust to holders of Asbestos Claims represent damages on account of personal physical injuries of such holders, such holders should not recognize gross income under § 104 of the IRC, except to the extent such payments are attributable to medical expense deductions allowed under § 213 of the IRC for a prior taxable year. The tax consequences of payments from the Asbestos Trust to holders of Claims in Class 4 (other than those described in the preceding paragraphs) will depend on the nature of the Claim and the particular

circumstances and facts applicable to the holder of the Claim at the time each such payment is made.

(c)     Tax Consequences To Holders of Class 1, 2, 3 and 5 Claims. A holder of a Claim in Classes 1, 2, 3 and 5 will recognize gain or loss equal to the difference between (1) the amount of Cash and the fair market value of other property received (less the portion thereof attributable to accrued interest); and (2) the basis the holder has in such Claim. If such holder receives property under the Plan in satisfaction of the Claim, the holder will acquire a basis in the property equal to the fair market value of the property as of the date received. Such tax basis would be allocated among the items of property received based on the relative fair market values of such items of property on the Effective Date. The holder's holding period in property received in the exchange would commence on the day after the Effective Date.

(d)     Tax Consequences to Holders of Class 6 Equity Interests. A holder of a Class 6 Interest may not have any tax consequences resulting from the implementation of the Plan.

(e)     Information Reporting and Withholding. All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

Recently effective Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated on or after January 1, 2003, including, among other types of transactions, the following: (1) a transaction offered under "conditions of confidentiality"; (2) a transaction where the taxpayer was provided contractual protection for a refund of fees if the intended tax consequences of the transaction are not sustained; (3) certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds; and (4) a transaction in which the taxpayer's federal income tax treatment differs by more than a specified threshold in any tax year from its treatment for financial reporting purposes. These categories are very broad; however, there are numerous exceptions. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

10.3     Tax Consequences to the Asbestos Trust.

As previously stated above, the law with respect to certain federal income tax consequences of the Plan is uncertain. Accordingly, State Insulation intends to seek either (i) a

private letter ruling from the IRS confirming that the Asbestos Trust will qualify as a "qualified settlement fund" within the meaning of § 468B of the IRC and the regulations promulgated thereunder or (ii) other decisions, opinions or assurances regarding certain tax consequences of the Plan. Notwithstanding, the receipt of property by the Asbestos Trust from State Insulation will not constitute taxable income to the Asbestos Trust, the adjusted basis of the assets transferred by State Insulation to the Asbestos Trust will be the fair market value of those assets at the time of receipt, and the Asbestos Trust will be taxed on modified gross income as defined within the regulations (generally at the highest rate applicable to estates and trusts).

THE FOREGOING DISCUSSION IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX ADVISOR. THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES ALSO MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH CLAIM HOLDER. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

### ARTICLE 11
### FINANCIAL INFORMATION

11.1    <u>Generally</u>.

Since the commencement of the Reorganization Case, State Insulation has been required to file monthly operating reports with the Bankruptcy Court. Such financial information is on file with the Bankruptcy Court and available for public review.

11.2    <u>Reorganized State Insulation's Financial Projections</u>.

State Insulation has prepared Reorganized State Insulation's Financial Projections, a summary of which is attached hereto as Exhibit C. Variances in the forecasted financial information contained therein may result from unforeseen factors. However, Reorganized State Insulation's Financial Projections represent State Insulation's present judgment of the projected business operations of Reorganized State Insulation.

ALTHOUGH STATE INSULATION BELIEVES THAT THE FINANCIAL PROJECTIONS ARE REASONABLE IN LIGHT OF CURRENT FACTS AND CIRCUMSTANCES KNOWN TO STATE INSULATION'S MANAGEMENT, THE PROJECTIONS ARE BASED ON A NUMBER OF ASSUMPTIONS AND ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES WHICH ARE BEYOND THE CONTROL OF REORGANIZED STATE INSULATION. THEREFORE, THERE CAN BE NO ASSURANCE THAT THESE PROJECTIONS WILL BE REALIZED AND ACTUAL OPERATING RESULTS MAY BE MATERIALLY HIGHER OR LOWER THAN FORECAST.

**ARTICLE 12**
**SOURCES OF INFORMATION PROVIDED AND THE ACCOUNTING METHOD USED**

12.1     <u>Sources of Information</u>. The information set forth in this Disclosure Statement and the exhibits hereto was provided by State Insulation and the Creditors' Committee. The Creditors' Committee has independently investigated the financial and business affairs of State Insulation.

12.2     <u>Accounting Method</u>. State Insulation's staff accountants maintain its books and records on an accrual basis, in accordance with generally accepted accounting principles.

[This space intentionally left blank.]

## RECOMMENDATION AND CONCLUSION

State Insulation recommends that all holders of Claims in Class 4 vote to accept the Plan and urges them to evidence such acceptance by returning their Ballots in the enclosed envelope or faxing their Ballots to the Balloting Agent so that they will be received on or before 5:00 p.m., Eastern Time, [      ], 2011.

The Plan provides, in the view of State Insulation, the best available alternative for maximizing the distributions that holders of Claims will receive out of its bankruptcy Estate.

This Disclosure Statement may be executed in any number of counterparts, each of which when executed shall be deemed to be an original and all of which shall be deemed one and the same instrument.

The undersigned has executed this Disclosure Statement as of June 16, 2011.

Respectfully submitted,

State Insulation Corporation

By: _____

Name: George Lionikis Jr.

Title: CEO/ Treasurer

-61-